# Staunton

## West Brothers Brick Company, Inc. v. The City of Alexandria, Virginia.

September 23, 1937.

Present, All the Justices.

The opinion states the case.

*John S. Barbour*, for the appellant.

*Carl L. Budwesky* and *Thomas B. Gay*, for the appellee.

HOLT, J., delivered the opinion of the court.

West Brothers Brick Company, Inc., appellant here and complainant below, contends that it has a right to mine and remove a bed of clay on a certain tract of land owned by it and lying within the corporate limits of the city of Alexandria. The city contends that this company has no such

right and refuses to permit the prosecution of that proposed undertaking. An injunction was sought and refused; hence this appeal.

This lot is an eighteen-acre tract practically undeveloped, triangular in shape, bounded on the south by First street, on the west by Henry street, on the northwest at the apex of the triangle by the property of the Richmond, Fredericksburg and Potomac Railroad, and on the northeast and east by the Washington and Alexandria Road, sometimes known as the Old Georgetown Road.

To the east and one block from its eastern apex runs the Mount Vernon Memorial Boulevard. All of the land lying to the south between it and the center of the business section of the city, distant nine blocks away, has been set apart for residential purposes.

The West brothers were brick-makers and had for many years followed that vocation at their plant in what is now known as Arlington county, Virginia. That business was taken over by the plaintiff corporation on May 20, 1902, which since then has been making both brick and hollow tile. It is an undertaking of moment. In 1926 it was greatly enlarged and now represents an investment of about a half million dollars and has a payroll on which are between two and three hundred men. The plant itself is about two miles from the city limits and about four miles from the lot in controversy. This company owned and owns about one hundred and thirty acres of clay land, but in 1927, anticipating that their supply of raw material might someday be exhausted, it commenced a quest which turned out to be successful and located this lot, on which there is a bed of clay from eight to fourteen feet deep, suitable for its purposes and well adapted to the making of high-class tile. It was carefully inspected and then purchased at the price of $47,000. At that time about 20 per cent of that lot lay within the city limits, the balance being in the county. More than a year after this purchase these limits were extended. This extension went into effect on January 1, 1930, and includes all of this eighteen-acre lot.

It seemed desirable to the city that there be established within its limits certain zones or territorial sections to be set apart for certain designated uses. To that end it secured the services of Irving C. Root, city planner for the Maryland National Capitol Park & Planning Commission, and an expert with twenty years experience in work of this kind. He was employed to prepare and undertook to prepare a comprehensive zoning plan, showing property adapted to residential, commercial and industrial uses, and in conjunction with a commission appointed for the purpose was engaged in this work for about a year. There were public hearings held by it and one at least by the mayor and city council, after which and on July 25, 1931, that council, acting under authority of chapter 122A of the Code, sometimes known as the Enabling Act (Acts 1926, ch. 197, as amended by Acts 1930, ch. 205), adopted a comprehensive ordinance, known as Zoning Ordinance 109, the plan adopted being substantially that recommended by its commission. This plan thus adopted classified all of appellant's eighteen-acre tract as residential except a one-hundred-foot strip which bordered on Henry street and which was set apart for industrial uses.

This situation continued without protest until the latter part of 1934, when appellant petitioned the city council to rezone its land to the end that it might all be classed as industrial—this in order that it might obtain permission to begin excavation of its underlying clay bed. At that hearing counsel for the Brick Company appeared on its behalf. Relief was resisted by A. S. Doniphan, an adjoining property owner. Written protests were also received from the Alexandria Chamber of Commerce and the Sixth Ward Citizens Association. Petitioner's request was denied by a vote of six to three. Thereafter and on July 1, 1935, the bill in this cause was filed, its prayer being that a declaratory decree be entered quieting the right and title of said complainant to the use of its premises and enjoining the city and its officials from interfering therewith. It was heard on depositions, answer and exhibits; the court, upon

consideration thereof, being of the opinion that complainant was not entitled to the relief prayed for, did so decree.

Evidence for the complainant shows or tends to show the following facts:

This land, sometimes spoken of as the Taylor land or lot, was, to the extent that it was used at all, used as farm land when purchased by petitioner. On it were five or six residential buildings of little value; nor had there been any residential developments of moment in its neighborhood. Mr. West, president of the plaintiff company, tells us of conditions:

"To the west is a large ice manufacturing plant and to the south of that was a lumber yard and mill plant; to the east there were some small stores, as I remember, sort of a roadside stand selling groceries and eatables, such as motorists would stop and buy. To the south was a warehouse, I think known as Janney's Warehouse, and also there are other small industries in the immediate vicinity. I might state there was also a colored settlement immediately south of this property consisting largely of some very dilapidated types of colored dwellings. I might also state there is a railroad track along the Washington-Alexandria roadway between the highway and this property line, which railroad track, I think, connected with the Janney's Warehouse."

A number of other witnesses, among them Mr. Ezra, a member of the zoning commission, has testified. The substance of their evidence is that this land is better suited for industrial than for residential purposes and that there has never been any real residential development in its immediate vicinity. We have seen that four blocks along its western edge, fronting on Henry street and which lie between it and the Potomac yards, were set aside for industrial purposes and are not involved in this litigation.

Both brick and tile are made. For the latter a more plastic clay is necessary. This necessary characteristic appears in the underlying stratum on the Taylor lot and makes it valuable. Its gross value has been placed at $18.00 a

cubic yard. From this, of course, must be deducted all costs incident to its use. If its use is forbidden, that part of plaintiff's plant devoted to that work must sometime be abandoned, unless other available supplies can be uncovered, but it is also true that this deposit was neither relied upon nor known when the tile plant and kilns were built.

So far as this testimony deals with existing conditions as distinguished from opinion, it has not been seriously questioned.

For the city, Mr. Allwine, manager for the Portner properties, testified. That estate has large holdings in Alexandria, one of which is a lot east of this Taylor land and separated from it by the Washington and Alexandria Road. That lot, this witness thinks, is valuable for residential purposes but that such value would be wholly destroyed if the Brick Company be permitted to develop its property in the manner desired. Negotiations for the sale of the Portner property to Mr. Hillegeist at the price of $42,000 are now under way. He represents a number of men who plan to build on it an apartment to consist of thirteen units, together with an underground garage which will accommodate 104 cars, all at a cost of something under $2,000,-000. This proposed development would be seriously affected if the Brick Company's plans are carried out.

Mr. Root, another witness for the city, is a city planner with twenty years experience. He was employed by Alexandria and worked with its zoning commission for about a year. Existing conditions were studied and future possibilities were considered, based upon the center of population, traffic lanes, transportation facilities, etc. Public hearings were had and the conclusion was reached that a residential development here was most desirable, one of the features considered being the proximity of the Mount Vernon Memorial Boulevard. Speaking of that factor, he said:

"It was one of the factors, because the agreement between the City and the Federal Government regarding the development of that Memorial Boulevard called for its resi-

dential use, and being protected for residential use and undoubtedly available for structures of a high character, it was assumed by myself that the influence of that high residential character would extend a considerable distance in that direction from the Memorial Boulevard."

He also tells us why those lots fronting on Henry street were classed as industrial:

"The property, the portion of this West Brothers property facing the ice plant, which is zoned industrial, should also be zoned industrial because it would be obviously unfair to say that one side of the road should be zoned industrial and the other side should be denied a similar use, but that is only for the depth of the frontage actually facing on the ice company property; and the city plan contemplated the division of the rest of the West Brothers property into building lots, one tier of which would back on this industrial zoning on the west side of the property, so that in that way there would be a screen created by the residence that would back on the industrial property, and so the industrial use would have less injurious effect on the balance of the West Brothers property."

Mr. Reardon, another witness, was a member of the zoning commission. Among the reasons which influenced him are these:

"That property and all the property at the head of Washington Street there was considered an anticipated very high class development along the Boulevard, and due to the development, the Mall development in Washington, it was felt and believed and is still believed that that end of Washington Street would be a most desirable residential section."

Mr. Kane, another member of that commission, said that he realized that this property was not highly desirable for residential purposes but that it would in the future be well suited for homes of a less expensive type.

Other witnesses thought that this classification was fair, and they testify as to the undesirable conditions which would necessarily follow the excavations which the Brick Company proposes to make.

■ That territory south of the Potomac and contiguous to Washington has in recent years witnessed extraordinary developments. The time is not distant when Alexandria and Arlington county will constitute one urban community and for this city planning is not only desirable but necessary. Zoning ordinances are devices of recent invention and are intended to conserve those elements which make life in cities livable. Necessarily private rights and public interests sometimes clash. Such conflict is as old as law itself. *Sic utero tuo,* etc., is an ancient maxim, whose applicability is constantly being extended at the expense of private interests. Plainly the owner of a lot on Franklin street in Richmond should not be permitted to operate a fertilizer factory there, nor is this invasion of private rights confined to matters so patent. Until recently in Virginia, a dairyman might sell his milk to all who wished to purchase. Now, before he can sell at all, he must secure the consent of a commission. Courts take cognizance of public and social developments and balance them as best they can against private rights.

■ Conflicts between constitutional guaranties and the police power constantly arise and indeed are inevitable. To them this is said to be a proper approach: "Where the police power conflicts with the Constitution, the latter is supreme, but the courts will not restrain the exercise of such power, except where the conflict is clear and plain." *Buck* v. *Bell,* 143 Va. 310, 130 S. E. 516, 519, 51 A. L. R. 855.

■■ Zoning ordinances have everywhere been adopted. Their validity was once challenged, but they are now generally recognized as a proper use of the police power. McQuillen's Municipal Corporations, vol. 2, p. 1051. And certainly they are valid in Virginia. *Nusbaum* v. *Norfolk,* 151 Va. 801, 145 S. E. 257; *Gorieb* v. *Fox,* 145 Va. 554, 134 S. E. 914, 916; *Id.,* 274 U. S. 603, 47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210; *Eubank* v. *City of Richmond,* 110 Va. 749, 67 S. E. 376, 19 Ann. Cas. 186; *Id.,* 226 U. S. 137, 33 S. Ct. 76, 57 L. Ed. 156, 42 L. R. A. (N. S.) 1123, Ann.

Cas. 1914B, 192, so long as they are not arbitrary and unreasonable. Under settled rules of construction, they must be sustained if their reasonableness is debatable. *Martin* v. *Danville*, 148 Va. 247, 138 S. E. 629, 630; *Euclid* v. *Ambler Realty Co.*, 272 U. S. 365, 47 S. Ct. 114, 118, 71 L. Ed. 303, 54 A. L. R. 1016. The city council of Alexandria is better acquainted with the necessities of that city than we are. In *Gorieb* v. *Fox, supra,* this court said:

■ "The legislature may, in the exercise of the police power, restrict personal and property rights in the interest of public health, public safety, and for the promotion of the general welfare."

■ This power "embraces regulations designed to promote the public convenience or the general prosperity, as well as regulations designed to promote the public health, the public morals or the public safety." *Bacon* v. *Walker,* 204 U. S. 311, 27 S. Ct. 289, 291, 51 L. Ed. 499.

"The power is not limited to regulations designed to promote public health, public morals, or public safety, or to the suppression of what is offensive, disorderly, or unsanitary, but extends to so dealing with conditions which exist as to bring out of them the greatest welfare of the people by promoting public convenience or general prosperity." *Wulfsohn* v. *Burden* (1925), 241 N. Y. 288, 150 N. E. 120, 122, 43 A. L. R. 651.

■ Aesthetic considerations alone are not enough but they should be considered.

"It seems to us that aesthetic considerations are relative in their nature. With the passing of time, social standards conform to new ideals. As a race, our sensibilities are becoming more refined, and that which formerly did not offend cannot now be endured. That which the common law did not condemn as a nuisance is now frequently outlawed as such by the written law. This is not because the subject outlawed is of a different nature, but because our sensibilities have become more refined and our ideals more exacting. Nauseous smells have always come under the ban of the law, but ugly sights and discordant surroundings

may be just as distressing to keener sensibilities. The rights of property should not be sacrificed to the pleasure of an ultra-aesthetic taste. But whether they should be permitted to plague the average or dominant human sensibilities well may be pondered." *State ex rel. Carter* v. *Harper*, 182 Wis. 148, 158, 196 N. W. 451, 455, 33 A. L. R. 269. It might be hard to prove that a city dump was hurtful to health, but plainly it should not be located in a residential district. The days of kitchen middens are gone.

Indeed the inalienable rights of the individual are not what they used to be.

All of these considerations address themselves primarily to the legislature (city council), and its judgment stands unless there has been plain abuse of its wide discretion.

In the instant case, these are those whose unanimity of conclusions is relied upon by the city: We have an expert city planner with twenty years' experience; we have the judgment of the Zoning Commission; we have the judgment of the mayor and city council when the ordinance framed by its commission was in substance adopted, and we have the judgment of that council at a later date, which, after a full hearing, declined to reclassify this land. It would be extraordinary, indeed, if their conclusions upon questions of fact were so utterly wrong as not to be debatable.

Zoning ordinances, in the main, deal not with present conditions but with conditions to come. They are not designed to Haussmannize a city but to guide its future growth. Necessarily any plans of that nature must be in some degree arbitrary. It is seldom that there is any definite reason for holding that a lot on one side of a line should be devoted to one purpose and that just across it to another. The adaptability of certain territorial sections of cities to certain uses fade into each other.• One end of a field may be, beyond peradventure, suited to industrial developments, the other to private homes. Intervening there must be a. twilight zone. If the legislature can-

not be relied upon to say where lines must run, who can be vested with that discretion? Demonstrative accuracy is an impossibility.

"The boundary line of a zoning district must be fixed in some locality. In the very nature of things it must always be more or less arbitrary, because the property on one side of a line cannot, in the very nature of things, be very different from the property on the other side of the line." *In re Dawson* (1929) 136 Okl. 113, 277 P. 226, 228.

This statute is not retroactive and was not intended to make unlawful any use of a building or premises lawful when it went into effect, and so under the doctrine of non-conforming uses complainant contends that it desires but to continue a use already in effect.

In support of this contention we are cited to *Appeal of Haller Baking Company*, 295 Pa. 257, 145 A. 77, 79. That was a case in which a major stable was forbidden within a certain district. A major stable was one which could accommodate four or more horses. When the Pennsylvania statute took effect fewer than four horses were stabled there, although there were accommodations for twenty-five. The court held that there had been no abandonment and said:

"This stable had been used continuously until 1924. Since then the quantity diminished very materially, but it was still used for its original purpose, and it is appellant's purpose and effort to continue the use. This does not show an intention to abandon, nor would the fact that on the day of the adoption of the ordinance, or a number of days before, no horses were in the building. A property right, such as is involved in this case, having attached, cannot be lost by that circumstance."

In the instant case, this clay bed had never been used. It was bought, as we are told, for future use, and not having been used at all, the doctrine of non-conforming uses has no application.

It is next said that the ordinance as construed and applied violates the statute under which it was passed.

"The Title of this Act (Acts 1926, ch. 197, p. 345; Va. Code, sections 3091 (1) to 3091 (26)) is as follows:

" 'AN ACT TO ENABLE THE COUNCIL * * * OF CITIES * * * to divide the municipal area into one or more districts and in such Districts to *regulate* the use of land and of buildings or other structures, and the height thereof, and also to establish building lines and to regulate and restrict the construction and location of buildings and other structures * * *.' "

And in support of this contention we are cited to *Opinion of the Justices,* 232 Mass. 605, 124 N. E. 319, 321, in which it was held that the power to regulate the uses of property did not confer the power to utterly prohibit its use and that the regulations themselves must be within reasonable limits.

These principles are well recognized in Virginia. Private property shall not be taken or damaged for public uses without just compensation. Constitution of Virginia, section 58. Likewise we are told that the exercise of the police power of the State shall never be abridged. Constitution of Virginia, section 159. We would be less than frank if we did not concede that those two great principles clash at times. Plainly the city of Richmond has a right to say that an abattoir shall not front on Monroe Park. Such a regulation would be in the interest of the public and possibly at the expense of some lot owner. The owner might still use his lot, but not for that purpose. This power of the State to regulate is incidental to every private title. Under the guise of regulation property cannot be taken, but no demand for compensation can be sustained because of some reasonable regulation which may affect its use or even its value. It is not true that a man may always do what he will with his own. Personal liberty itself is regulated. One cannot set his field afire and burn up his neighbor's fences. All of this rests upon established principles.

In *Gorieb* v. *Fox, supra,* it is said: "It is not contradicted that the legislature may confer the police power of the State upon cities and towns located therein. The extent of this power is difficult to define, but it is elastic and

expands automatically to protect the public against the improper use of private property to the injury of the public interest. It must never be exercised except in a reasonable manner and for the welfare of the public."

In that case there is cited with approval from *Town of Windsor* v. *Whitney*, 95 Conn. 357, 111 A. 354, 356, 12 A. L. R. 669, this statement:

"The line between eminent domain and the police power is a hard one to hold with constancy and consistency, and it is not surprising that now and again these two great powers of government have been confused. A few years ago it was, so far as the rule had been announced, undoubted that restrictions could not be imposed upon a private property solely for aesthetic considerations. Later it has been said by high authority that aesthetic considerations may be regarded in connection with recognized police power considerations. And now Dillon in the latest edition of his Municipal Corporations, section 695, says:

" 'The law on this point is undergoing development, and perhaps cannot be said to be conclusively settled as to the extent of the police power.' "

In that same case it is said: "The State may regulate the use of property to the point of forbidding thereon certain businesses in themselves lawful."

These regulations, among their incidental effects, in terms of money may diminish the value of land so regulated. For such injuries the law affords no remedy. It is *damnum absque injuria.*

Evidence is not needed to tell us that an eighteen-acre clay pit within a city's limits and near a great national boulevard would be an eyesore and a nuisance.

Next it is said that the act itself is invalid in that its title does not express its purpose, or at any rate does not express a purpose to prohibit the lawful use of land. Its title is:

"An Act to Enable the Council * * * of Cities * * * to Divide the Municipal Area into One or More Districts and

in Such Districts to *Regulate* the Use of Land and of Buildings or Other Structures * * *."

This brings us back to matters heretofore considered. No general use of this land is prohibited; certain uses are, though they may be in themselves lawful. Ordinarily it is lawful for a man to cover his lot with a building, but under the power to regulate, this right may be overborne. The owner may be told to set it back, and the fact that he may suffer loss in this loss of space gives him no right to relief.

Moreover this constitutional provision, "No law shall embrace more than one object which shall be expressed in its title" (section 52), is to be liberally construed. *Bunkley* v. *Commonwealth,* 130 Va. 55, 108 S. E. 1. If the title be not misleading and if those things are done which are germane to it, that is enough. This constitutional provision was intended to prevent the insertion of rights or reservations which cannot bear the light of public scrutiny and which, if uncovered, would not be tolerated. Where this is done that provision should be enforced to the letter.

Next it is said that complainant's property has been both damaged and taken without just compensation, contrary to the provisions of sections 6, 11 and 58 of the Constitution of Virginia. Plainly this property has not been taken although it has undoubtedly been damaged, but, as we have seen, that damage which is incidental to a lawful exercise of police power is not the damage contemplated by these protective provisions invoked.

In *Gorieb* v. *Fox, supra,* this court said:

"The Virginia Constitution declares that the exercise of the police power of the State shall never be abridged. Section 159.

"The legislature may, in the exercise of the police power, restrict personal and property rights in the interest of public health, public safety, and for the promotion of the general welfare. *Eubank* v. *City of Richmond,* 110 Va. (749), 751, 67 S. E. 376, 19 Ann. Cas. 186; *Welch* v. *Swasey,* 193

Mass. 364, 79 N. E. 745, 23 L. R. A. (N. S.) 1160, 118 Am. St. Rep. 523; Freund on Police Power, secs. 118, 128; *Attorney General* v. *Williams,* 174 Mass. (476), 477, 55 N. E. 77, 47 L. R. A. 314; *People* v. *D'Oench,* 111 N. Y. (359), 361, 18 N. E. 862; *Barbier* v. *Connolly,* 113 U. S. 27, 5 S. Ct. 357, 28 L. Ed. 923; *Bacon* v. *Walker,* 204 U. S. 311, 27 S. Ct. 289, 51 L. Ed. 499."

General welfare can no more be defined than can police power. These are terms which take on new definitions when we come to face new conditions. General welfare in Alexandria today may warrant regulations which would have been fantastic in Sherwood Forest.

Finally it is said that the statute and the ordinance as construed and applied in this case is violative of section 1 of the 14th Amendment to the Constitution of the United States.

The right of municipalities in Virginia under their police power to enact zoning ordinances can no longer be successfully challenged. *Gorieb* v. *Fox, supra.* In that case, confirmed on appeal to the Supreme Court, 274 U. S. 603, 47 S. Ct. 675, 71 L. Ed. 1228, 53 A. L. R. 1210, Mr. Justice Sutherland, commenting upon the ordinance under review, said that it must be sustained unless it is clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare, citing *Euclid* v. *Ambler Realty Co., supra.*

This rule is restated in *Martin* v. *Danville, supra,* in this form:

"It is a settled rule of the Supreme Court of the United States, if the question of reasonableness is fairly debatable, to hold that it will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of deciding the question."

See also, *Zahn* v. *Board of Public Works,* 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074; all of which goes back to this familiar principle: Courts uphold acts of the legislature whenever their constitutionality is debatable; presumptions are in their favor.

*Euclid* v. *Ambler Realty Co., supra,* is an instructive case. It is there pointed out that regulations now uniformly sustained would, half a century ago, have been rejected as arbitrary and unreasonable, and that the exclusion of industrial enterprises from residential districts bears a rational relation to the health and safety of the community. Attention is called to the fact that the law of nuisances is to be remembered. "A nuisance may be merely a right thing in a wrong place."

Judge Way, in discussing this particular statute, though not the zone in judgment, said:

"Taking the view most favorable to plaintiff's contention, this court cannot say as a matter of law that the question as to how plaintiff's property should be zoned is not debatable. It is fairly debatable, and the court may not arbitrarily substitute its judgment for that of the legislative body of the city on a question so vitally affecting the public safety and welfare." *Downham* v. *City Council of Alexandria* (D. C.) 58 F. (2d) 784, 787.

The fact that the location of lines may be in some degree arbitrary will not defeat the statute.

It was in the power of Alexandria to mark out as suitable for industrial purposes all of the land which lay between its center and the Potomac yards. It might have set apart that territory for residential purposes only, and it might have divided it between these two uses. The conclusion which the city did reach was reached after mature consideration and after public hearings.

Had it all been set apart for residences, business might have complained; had it all been set apart for business, home-owners might have objected, and it was in this light that this Zoning Commission, seeking to conserve the interests of the public generally, drew lines which are now charged to be utterly arbitrary and unreasonable, and its judgment after public hearing has been more than once confirmed.

As we understand complainant's contention, it does not attack the general power of cities to enact zoning ordi-

nances, but it does contend that this under review, as applied to the facts in the instant case, is both arbitrary and unreasonable—that is to say, a statute valid as to one set of facts may be invalid as to another. *Nashville, C. & St. L. Ry.* v. *Walters,* 294 U. S. 405, 55 S. Ct. 486, 79 L. Ed. 949.

It was there also pointed out that the police power could be invoked to include regulations promoting public convenience and general welfare, as well as those which relate directly to public health, safety and morals. How can it be said that this potential reservoir of stagnant water will not in days to come affect the welfare and comfort of this community? It would be a public and continuing nuisance. This pit, as has been suggested, might be used as a city dump; it is suited to no other purpose. Nor is it necessary that one be super-sensitive in order to find it artistically objectionable.

Many cases are cited as showing or tending to show the unreasonableness of the ordinance in judgment. Among them are these:

*Re Kelso,* 147 Cal. 609, 82 P. 241, 2 L. R. A. (N. S.) 796, 109 Am. St. Rep. 178. That was decided more than thirty years ago. A San Francisco ordinance prohibited the operation of a quarry in a given district. The court said that there were many ways of operating a quarry, some of which could harm no one. It recognized the fact that one operated by blasts might be prohibited and that its operations might be hedged about by valid regulations which would make it unprofitable. If that case intended to hold that the city cannot forbid the operation of quarries, operated as quarries are ordinarily operated, where people live or are accustomed to move, then it is out of touch with latter day extensions of police power.

The Supreme Court dealt with this subject in *Hadacheck* v. *Sebastian* (1915) 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927. There an ordinance which prohibited the manufacture of brick in a designated district was upheld but the right to dig clay there was in terms

left open. It did hold that vested interest could not defeat the proper exercise of police power which is in substance what has been held in Virginia. One has a vested interest in all of his city lot, but we have held that he may not always cover it by a building.

*Pennsylvania Coal Company* v. *Mahon,* 260 U. S. 393, 395, 43 S. Ct. 158, 67 L. Ed. 322, 28 A. L. R. 1321, deals with the right of a coal company to remove that commodity under conditions denied by statute. There the coal company gave to the complainant a deed in which it reserved the right to mine and since this right had been reserved, the plaintiff had no right to forbid its use. It is true that that decision goes beyond an adjudication of private rights and holds the statute to be an unwarranted exercise of police power. An interesting discussion of it will be found in *Marblehead Land Co.* v. *City of Los Angeles* (C. C. A.) 47 F. (2d) 528, where the court points out that there is no distinction between diminution in the value of land by limitations upon its use and where the owner is prevented from developing underlying mineral resources, citing *Zahn* v. *Board of Public Works, supra.*

In *Nectow* v. *City of Cambridge,* 277 U. S. 183, 48 S. Ct. 447, 448, 72 L. Ed. 842, a land owner in a district zoned as residential undertook successfully to have that classification set aside as arbitrary and unreasonable. The court, proceeding upon familiar principles, said:

"The governmental power to interfere by zoning regulations with the general rights of the land owner by restricting the character of his use, is not unlimited, and, other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare. *Euclid* v. *Ambler Realty Co., supra* [272 U. S. 365] at page 395, 47 S. Ct. 114 [71 L. Ed. 303, 54 A. L. R. 1016]. Here, the express finding of the master, already quoted, confirmed by the court below, is that the health, safety, convenience, and general welfare of the inhabitants of the part of the city affected will not be promoted by the disposition made by the ordinance

of the locus in question. This finding of the master, after a hearing and an inspection of the entire area affected, supported, as we think it is, by other findings of fact, is determinative of the case. That the invasion of the property of plaintiff in error was serious and highly injurious is clearly established; and, since a necessary basis for the support of that invasion is wanting, the action of the zoning authorities comes within the ban of the 14th Amendment and cannot be sustained."

No new principles of law were invoked; the court merely applied those which it had repeatedly approved to the facts found by the master. He held the classification to be unreasonable and his finding the court followed.

A leading case and one quite applicable to that in judgment is *Marblehead Land Co.* v. *City of Los Angeles, supra,* decided in 1931, certiorari denied on October 19th of that year. There in issue was the right to sink an oil well. The company owned two hundred and ninety-one acres of land, seven miles distant from the heart of the city, and theretofore used as a farm. This land was well adapted to residential uses, but the nearest dwelling was eleven hundred feet away. Large sums of money had been invested and the possibilities of returns thereon were unlimited. The ordinance was sustained. See also, *Beveridge* v. *Harper & Turner Oil Trust,* 168 Okl. 609, 35 P. (2d) 435, and *Cromwell-Franklin Oil Co.* v. *Oklahoma City* (D. C.) 14 F. Supp. 370.

In *Leary* v. *Adams* (1933) 226 Ala. 472, 147 So. 391, 395, money losses were considered. The court said:

"Petitioner presents a strong appeal from the standpoint of financial loss occasioned by this restriction. But, as said by the North Carolina court in *City of Elizabeth City* v. *Aydlett,* 201 N. C. 602, 161 S. E. 78, 81: 'Financial loss is not the test; the question is whether the scheme is sound, and the classification fair. If the question is fairly debatable, the court will not substitute its judgment for that of the legislative body which creates the ordinance.' "

On this point see *Hadacheck* v. *Sebastian*, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927, and *Chicago, B. & Q. Ry. Co.* v. *People of Illinois ex rel. Drainage Com'rs*, 200 U. S. 561, 26 S. Ct. 341, 50 L. Ed. 596, 4 Ann. Cas. 1175.

The enactment of zoning ordinances and cases which test them are all within the recollection of most of us. General rules applicable thereto are now well settled. They must not be wholly unreasonable, but they are presumed to be valid and to have been promulgated by those familiar with local conditions. Vested interests will not defeat them, and of course constitutional rights are not to be measured in terms of money. That, however, is a consideration to be remembered. Great financial losses should not be inflicted where benefits to others are negligible, but public welfare and public convenience do control and are in themselves terms constantly adjusted to meet new conditions. Upon those who would set aside such ordinances rests a heavy burden of proof. They stand when their validity is debatable.

An eighteen-acre clay pit in a growing town, contiguous either to residences or business establishments, would doubtless be objectionable. Where it is forbidden by statute (a zoning ordinance), the burden of showing that it is necessary, or even desirable, as adding to the comfort and welfare of the city, does not rest upon it. Statutes are presumed to be valid expressions of legislative will and stand until this is disproven.

The decree appealed from should be affirmed, and it is so ordered.

*Affirmed.*

BROWNING, J., dissenting.