# Richmond

## WASHINGTON AND OLD DOMINION R. R. v. CITY OF ALEXANDRIA, VIRGINIA.

June 19, 1950.

Record No. 3682.

Present, Hudgins, C. J., and Gregory, Eggleston, Spratley, Buchanan and Miller, JJ.

The opinion states the case.

*Hardee Chambliss, Jr.* and *Wilson M. Farr,* for the plaintiff in error.

*Hannon E. Norris* and *V. Floyd Williams,* for the defendant in error.

MILLER, J., delivered the opinion of the court.

The Washington and Old Dominion Railroad, hereinafter called defendant, was convicted by a jury and fined $10.00 for violation of the zoning ordinance of the city of Alexandria. From the judgment confirming that verdict, this writ of error was granted.

The warrant charged that defendant "did unlawfully erect a structure in an A-Residence zone, to-wit, a coal trestle for operation and use of a fuel yard on the Washington and Old Dominion right of way" near Randolph street in said city in violation of the zoning ordinance.

Briefly stated, the facts are that defendant leased to one Arthur F. Campbell an otherwise unused part of its right of way. On it he sought and undertook to operate a fuel yard, and this trestle, from which to unload coal cars, was being erected thereon as incident to and a part of this private enterprise. The structure and that character of business is forbidden in an A-Residence zone.

Several errors are assigned by defendant to rulings of the court. Consolidated and summarized, they bring into question (1) the sufficiency of the evidence to factually prove whether or not the area in question, *i. e.,* defendant's right of way, has ever been zoned and thus the adequacy of the proof to establish that defendant has committd any offense; (2) whether or not the city enjoys the legal right to zone the property and facilities of a public service corporation leased for private industry but still served by the corporation for a consideration, and (3) if this right of way one hundred feet in width extending a long distance across the city and adjoining property variously and differently classified be zoned A-Residential, is such classification so unreasonable, discriminatory, and arbitrary as to be void?

In our opinion the decisive question is presented by the

assignment first above which questions the sufficiency of the evidence to prove beyond a reasonable doubt that the right of way was zoned. That issue is more factual than legal, and if resolved adversely to the city, it obviates the necessity of considering other assignments of error.

Obviously unless defendant's right of way at the location indicated has been actually zoned no offense has been committed. That it had been zoned an A-Residential area at the time the erection of the trestle was undertaken is, in any event, a necessary fact and circumstance encumbent upon the city to prove beyond a reasonable doubt. Otherwise stated, if the right of way had not in fact been zoned A-Residential area no crime has been committed, or if the evidence fails to establish beyond a reasonable doubt that it was so zoned, then it is insufficient to sustain the conviction.

Defendant's plea of not guilty denied all material allegations in the warrant and imposed upon the city the burden of proving beyond a reasonable doubt every essential fact necessary to establish guilt.

The objective crime, and as such, the corpus delicti, as well as defendant's criminal agency must be proved. And where evidence essential to proof of the crime is equally susceptible of two interpretations, one of which is consistent with innocence, that interpretation which incriminates may not be arbitrarily or unreasonably adopted. 3 Va. & W. Va. Digest (Michie) "Criminal Law", sec. 80(1), p. 267, and cases cited.

Two of the sections of Chapter 122A, Code of Virginia, 1942, *viz.*, sections 3091(1) and 3091(3), now sections 15-819 and 15-821, Code, 1950, under which the city enacted its zoning ordinance, read, respectively, in part, as follows:

"For the promotion of health, safety, morals, comfort, prosperity, or general welfare of the general public, the council or other governing body of any city or town may, by ordinance, divide the area of the city or town into one or more districts of such shape and area as may be

deemed best suited to carry out the purpose of this chapter, and in such district or districts may * * * regulate and restrict the location, erection, construction, reconstruction, alteration, repair or use of buildings or other structures * * * and the trade, industry, residence and other specific use of the premises in such district or districts." (Sec. 3091(1), Code, 1942, sec. 15-819, Code, 1950.)

"Such regulations shall be made in accordance with a comprehensive plan, * * *. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the city or town." (Sec. 3091(3), Code, 1942, sec. 15-821, Code, 1950.)

Pursuant to the power granted by this legislative authority, yet limited by its inhibitions, the city enacted its zoning ordinance, which is Chapter 28 of the City Code.

Subsection (B), of section 4, Article III thereof, among other things, provides:

"(B) In the 'A' residence zones unless hereinafter provided, no building or premises shall be used and no building or structure shall be hereafter erected, altered, or repaired except for one or more of the following uses."

The several permitted uses in an "A" Residental zone are then enumerated.

Section 3, Article II, of the ordinance reads:

"Sec. 3. Location and Boundaries of Zones. The boundaries of said zones shall be as shown upon the revised map designated as 'Second Revised Zoning Map,' dated March, 1946, signed by the Mayor of Alexandria, and the Clerk of the Council, on file in the office of the City Engineer, which is hereby made a part of this chapter, and said revised map and all notations, references and other data shown thereon is by this reference made a part hereof to the same extent as if the information set forth on said map were fully described and incorporated herein."

By authority of the ordinance and as noted on the legend of the Second Revised Zoning Map, the city is divided into six principal or major zones, and two of those are subdivided. There are four residential zones: "A-1", "A", "B", and "C", each, however, allowing somewhat different structures and additional uses. Zone "C" is subdivided into "C-1" and "C-2". There is a zone designated "D" Commercial, which is also further divided into "D-1" and "D-2", and there is an "E" Industrial zone.

The map was filed as an exhibit and the legend thereon provides eight colors (if white be termed a color) for the several zones. This number of zone colors is necessary because C and D zones are subdivided and so have two colors each.

The map—from which must be determined primarily whether all sections or areas of the city are actually zoned, and, if so, their respective classifications—is on a white background. A-Residential areas are by the color legend also designated white, being exactly similar to the background color.

From the ordinance it appears that streets are not zoned, though they are likewise white on the map. Where they border or separate different zones, they merely serve as dividing lines between such areas, though throughout their courses they bear the same color as the map background.

No records or minutes of the council or notes of the draftsman of the map bearing upon this vital question are in evidence. Testimony given by witnesses on behalf of the city affords but little aid in this respect. It is of trivial value to sustain or refute either claim, but, such as it is, it rather tends to cast more doubt upon and weaken the contention that all white areas are zoned A-Residential.

Nor does it appear from Chapter 28 that either the council, when it enacted the ordinance (or later amended it), or the draftsman, when he prepared the map, intended that all white areas be zoned. The ordinance is silent in that

respect and the color legend is merely a parallelogram on a white background and appears thus—"/⎯⎯/ Zone A Residential."

Defendant's one hundred foot wide right of way extends a long distance across the city. It traverses the north portion thereof along a slightly curved course but runs generally from southeast to northwest. Though it passes through various different zones throughout its entire length, it is white and similar to the streets which concededly divide zones. On the map it appears as a long white line across the city (with a black mark in the center to indicate the track), winding its way near to, across or between many other differently colored zones.

At one place it presents the picture of a narrow white thread flanked on each side by purple, which represents the far removed in character and use, Industrial Zone E. At certain points this strip of white is bordered on both sides by zones of green, which color represents no character whatever of residential area, but according to the Color Legend, indicates D-2 Commercial. In that zone are allowed buildings and structures devoted to and in which are conducted heavy commercial businesses of almost any kind. In other sections along its course, the white right of way is bordered on one side by the orange color of the far less strictly classified C-2 Residential zone and immediately on its other side is the green of D-2 Commercial. And in some sections, the white right of way is bordered by one of the many colors on its north side, with the white of a residential block or blocks on the south side.

Many areas such as the right of way of the Richmond, Fredericksburg and Potomac Railroad, which crosses the city from south to north, the Potomac Yards (a large section traversed by the tracks and devoted to industrial activities of five railroads), swamp lands, water courses and creeks, along with other areas unsuited for the uses allowed in residential zones, appear "white" on the map. Their location, physical characteristics, adaptability, and present uses,

as well as their topography, render them apparently wholly unsuited for that classification. In addition, two large sections constituting several acres each, which appear to be owned by the United States and marked, "U. S. Signal Corps", and "U. S. A.", respectively, and within the corporate lines, are white on the map. If owned by the government, which from the map seems to be true, then clearly Alexandria cannot zone them.

So if solely because all areas which appear "white" are to be conclusively deemed zoned as A-Residential areas, then that classification as it here appears is unnatural and borders upon if it is not actually so unreasonable, arbitrary, and capricious as to be void. 62 C. J. S., "Municipal Corporations", secs. 226 (2) to (6) incl., pp. 420 to 436, and sec. 228 (1); Zoning Law and Practice, Yokely, Ch. 2, sections 26 and 27; 58 Am. Jur., "Zoning", secs. 39 and 42; McQuillin, Municipal Corporations, Vol. 8, secs. 25.88 and 25.102, and *West Bros. Brick Co.* v. *Alexandria*, 169 Va. 271, 192 S. E. 881.

As a whole, the map of multicolored areas with this and other white lines actually representing railroad yards or rights of way winding across it and between the varied hues presents a cross-word puzzle of intricate and unnatural pattern, if these haphazard strips of white are to be deemed A-Residential zones. Unless proved by clear and convincing evidence, it is difficult to lend one's approval to that incongruous and unnatural construction of the map and legend, contended for by the city.

The fact that the statute requires that classifications be reasonable as to the character of the districts and their suitability for particular uses adds weight to the belief that this right of way was never intended to be designated A-Residential area.

For aside from its present use for railroad purposes, it might well be said that an attempt to confine this right of way from end to end (within the city) to only those buildings, uses and occupations allowed in the A-Residential

zone, bears no reasonable relation to the health, safety, morals, comfort, prosperity or general welfare of the public.

We are not unmindful that the defendant has been convicted by a jury and its verdict approved by the trial court. Yet there is no conflict in the testimony and if the map be reasonably appraised as a whole though in the light most favorable to the city as it must now be, it definitely fails to establish to the exclusion of any other reasonable hypothesis an actual zoning of all areas in the city.

We are therefore led to the inescapable conclusion that the evidence falls short of proof beyond a reasonable doubt that the right of way has been in fact zoned.

It necessarily follows that the judgment of the trial court is reversed and the prosecution dismissed.

*Reversed and dismissed.*