# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## Southern Railway Company v. City of Richmond, Et Al.

November 30, 1964.

Record No. 5762.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, I'Anson and Carrico, JJ.

*Thomas B. Gay* and *H. Merrill Pasco* (*Roderick D. Sinclair,* on brief), for the appellant.

*James A. Eichner, Assistant City Attorney* (*J. E. Drinard, City Attorney,* on brief), for appellee, City of Richmond.

*William Eldridge Spain,* for appellees, Henry A. Maurice, Jr.; John Prussing, et al., individually, and as Members of The Forest Hill-Woodland Heights Citizens Association.

CARRICO, J., delivered the opinion of the court.

This appeal is a sequel to the case of *City of Richmond* v. *Southern Railway Company,* 203 Va. 220, 123 S. E. 2d 641, where we decided, *inter alia,* that the State Corporation Commission was without jurisdiction to pass upon the validity of the zoning ordinance of the city, as applied to the railway. Following our decision, the railway filed against the city, in the Law and Equity Court of the City of Richmond, a motion for declaratory judgment (Code, § 8-578 *et seq.*).

The motion alleged that the railway owned a tract of land in the city of Richmond, adjacent to its main line right-of-way, which, under the zoning ordinance of the city, was included within the boundaries of R-3, R-4 or R-5 dwelling districts; that it had made certain improvements to the land preparatory to installing tracks and appurtenant facilities for use as an extension of its existing yard for the storage and handling of trains; that such extension was essential in order for it to perform its public duties, and that the city had taken the position that the railway did not have the right, under the zoning ordinance, to use the land for the extension of its yard facilities. The

motion prayed for a declaration that the zoning ordinance was, "unconstitutional and void to the extent that it is claimed to prohibit the construction and use by the Railway of the Proposed Facilities."

After a plea in abatement and a demurrer, filed by the city, were overruled, the city filed its answer asserting that its zoning ordinance was valid and applicable to prohibit the proposed use of the railway's land.

Henry A. Maurice, Jr., and others, individually and as members of the Forest Hill-Woodland Heights Citizens Association were, upon motion, permitted to intervene as parties defendant, and thereupon filed their answer adopting all pleadings filed by the city.

The trial court heard the evidence *ore tenus* and, in a written opinion and a final decree, upheld the validity of the zoning ordinance and ruled that the ordinance prohibited the proposed use of the railway's land. The railway was granted an appeal.

The evidence shows that the railway is a public service corporation doing a public transportation business by rail. The line from West Point through Richmond to Danville, where it connects with one of the railway's principal north-south lines, is known as the Richmond Division. Freight service only is furnished on this division, the passenger service once provided having been abandoned.

Richmond is the principal station on the Richmond Division, where the railway has 81 regular customers. Richmond is also the point of primary interchange of the railway with the lines of four other railroad companies and is the terminal of the railway's trains to and from Danville and to and from West Point.

The railway's line from Danville enters Richmond along the southern bank of the James River, passing the tract of land involved in this controversy, farther on running through the railway's Belle Isle and South Richmond yards, thence across the James via a bridge on the western end of Mayo's Island, then through the 28th Street yard and on to West Point.

The railway daily operates one through train from Danville to Richmond and one such train from Richmond to Danville. In addition, one local train is operated from Danville to Richmond on Tuesday, Thursday and Saturday of each week and another local train is operated from Richmond to Danville on Monday, Wednesday and Friday of each week. One local train makes the round trip from Richmond to West Point each day of the week.

The railway's operations in Richmond include the building and

breaking up of trains and the classification and switching of cars, incident to the delivery to and receipt from its customers of cars in Richmond and throughout the Richmond Division, as well as the delivery to and receipt from the other railroads of cars at the interchange points.

Previously, the South Richmond yard was used by the railway for the bulk of its work in the switching and classification of cars but, with the advent of diesel locomotives, this yard was gradually abandoned, except for storage purposes, and a portion of the yard was sold in 1961 to Reynolds Metals Company. Beginning in 1953, the railway began to use its Belle Isle yard, lying principally east of Lee Bridge, for its switching and classification work.

The railway considered its facilities at Belle Isle yard to be inadequate and, consequently, in 1960 began to improve the tract of land in question for use as an extension of its yard facilities, contemplating the ultimate location on the land of eleven tracks for the switching and classification of cars. The tract of land proposed to be used contains approximately 16 acres, a portion thereof having been owned by the railway since 1917 and the balance of 8.86 acres having been purchased by the railway in 1960, at a cost of approximately $530 per acre. The tract is located in South Richmond approximately 2800 feet west of Lee Bridge, between the southern bank of the James River and the northern edge of the railway's main line right-of-way, which is 80 feet wide. The tract varies in width from 50 feet to 250 feet and, prior to being improved by the railway, was low and swampy and subject to periodic flooding. The land lies below and to the north of a high bluff. Riverside Drive, one of Richmond's most scenic parkways, runs along the top of the bluff. Fronting on and south of the drive are located many substantial and attractive dwellings, in some of which the intervening parties reside.

Between the southern edge of the railway's right-of-way and the northern side of Riverside Drive, lies a strip of land of natural beauty which the city has acquired over a number of years for inclusion in its park system. Adjacent to the railway and south of a point about midway of the tract in question, is located Forest Hill Park, which was described in the testimony as one of Richmond's most beautiful parks.

The railway commenced to clear, drain, grade and fill the tract in July of 1960. The present controversy arose several months later when nearby residents and city officials learned of the use which the

railway proposed to make of the tract. The railway then suspended its improvement work, after expending the sum of $149,000 thereon.

Negotiations were conducted in November, 1960, between the objecting residents and railway officials in an effort to effect a compromise, without success. On January 9, 1961, the city council adopted an ordinance directing the proper officers of the city to take the necessary steps for the acquisition of the tract for park purposes.

The assistant city real estate agent contacted the superintendent of the Richmond Division of the railway with regard to the purchase of the tract, but the railway advised that it was not willing to sell. The litigation before the State Corporation Commission between the railway and the city, described in 203 Va. 220, then followed.

The tract in dispute was first placed in a residential zoning district by an ordinance adopted by the city on April 13, 1927, which permitted in residential districts:

"(14) Railway passenger stations, railway right-of-way, not including railroad yards." (Art. 3, sec. 4)

The 1927 ordinance also established certain business districts in the city in which were permitted:

"(10) Freight and other railway yards." (Art. 7, sec. 19)

The tract was continued in a residential district by a zoning ordinance adopted by the city on May 19, 1943. Neither railway rights-of-way nor railway yards were included in the permitted uses in residential areas under the 1943 ordinance. However, such uses were authorized in light industrial districts by virtue of their not having been excluded from such districts.

On June 1, 1960, the city adopted a new zoning ordinance, which again placed the land in question in a residential district. This ordinance, in R-1, R-2 and R-4 dwelling districts, permitted:

"(9) Rights-of-way and easements for public transportation and for public utilities." (Art. 5, sec. 39-12)

The June 1, 1960, ordinance did not expressly provide for the use of land for railway yards. However, such use would be permitted, under certain circumstances, in particular industrial districts.

On December 12, 1960, after the present controversy arose, the city adopted an ordinance amending and reordaining section 39-12 of Article 5 of the ordinance of June 1, 1960, so as to make the section read in the following language:

"(9) Rights-of-way and easements for public transportation and for public utilities but not including railroad yards for marshalling or

classifying cars, tracks for storage or parking railroad cars or trains of cars, freight depots or stations, loading platforms, train sheds, car or locomotive shops, motor vehicle repair shops or storage yards, generating plants or transformer stations."

It is upon these circumstances that the railway makes two contentions which it says point out the error of the trial court in denying it the relief for which it prayed.

■ The railway first contends that the use to which it proposes to put the land in question is necessary for the performance of its duties as a public service corporation, imposed upon it by law, and that insofar as the zoning ordinance purports to prohibit such use and thus prevent the performance of such duties, the ordinance is void.

Here, the railway says that the Constitution and statutes of Virginia impose upon it the duty, "to give reasonable and adequate service at reasonable rates and without delay" and vest in the State Corporation Commission exclusive authority to supervise, regulate and control railroad companies. The city is powerless, the railway asserts, by its zoning ordinance to prevent the proposed use of the land because this would interfere with the railway's performance of its public duties and constitute an invasion of the State Corporation Commission's authority to control the railroad companies.

The railway argues that it proved the necessity for its proposed use in the trial court but that the court erred in holding that such use was not necessary and that the ordinance did not, therefore, interfere with the railway's discharge of its public duties or encroach upon the State Corporation Commission's field of control.

The railway concedes that it had the burden of proving the necessity of the proposed use and that such was a factual issue. Although not so stated, inherent in the railway's position is the tacit concession that if necessity was not proven, the ordinance would not then interfere with the performance of its public duties or affect the State Corporation Commission's authority and would not, for those reasons, be void. The railway's first contention, then, fails if the evidence was sufficient to support the trial court's finding of lack of necessity.

The gist of the railway's case in this connection was that the dieselization of its system had resulted in longer trains which could not adequately be built and broken up and the cars classified and switched in its present facilities in Richmond, thus necessitating, so it claimed, the utilization of the 16-acre tract. It pointed to delays in the move-

ment of trains and delivery of cars which it attributed to the conditions in its Belle Isle and Richmond yards; it showed the amount of overtime wages it was required to pay to employees because of such delays; it demonstrated the unsafe working conditions present in its existing facilities; it stressed the business which it had lost to truck and barge companies and its inability to compete with those companies because it could not provide fast service; it complained that its Richmond Division business was "static" because of its, "inability to expand and improve our physical facilities," and it asserted that if it intended "to share" in the new business arising from the, "great potential in industrial development" in eastern Virginia, "we must prepare to handle it properly."

All of this was sufficient to show that there was considerable room for improvement of the railway's facilities in Richmond; that with such improvement, it might be able to operate more economically and more efficiently, from its standpoint, and with more safety to its employees; that it could put itself in a position, perhaps, to compete more profitably with truck and barge companies, and that it would, perchance, be able to garner a portion of the new business if such arose from the "potential" in industrial development in eastern Virginia.

But, though the evidence was sufficient to show that utilization of the 16-acre tract might be necessary to effect improvement of the railway's *internal* problems, that does not mean, *a fortiori*, that it was sufficient to prove that there was a *public* necessity that the land be so utilized.

To the contrary, there was no evidence that tended to indicate that the railway had, to any extent, failed to perform its public duty, that is, to give reasonable and adequate service at reasonable rates and without delay, or that it could not continue to do so in the reasonably foreseeable future. It was not shown that the railway's customers had ever suffered from the delays encountered by the railway in the conduct of its operations. There was no indication that there was, or reasonably soon would be, any public need incapable of fulfillment by the railway. No directive or policy of the State Corporation Commission was alleged to have been violated or left unobserved. The evidence did not show that the railway's loss of business in the Richmond Division was due to the inadequacy of the Richmond facilities but, rather, that such loss was a part of a general pattern of the loss of business, generally, by railroads to truck and barge competition

caused, in the words of one railway witness, primarily by, "our inability to quote minimum rates." And finally, there was testimony that the railway had not made full and proper use of its land in the Belle Isle and Richmond yards to provide more adequate classification and switching facilities.

In short, it was insufficient for the railway to show that it, and it alone, would have benefitted by the proposed improvements. More was needed—proof that the proposed use, once accomplished, would, in some way, benefit the public as well. Under these circumstances, the necessity for the contemplated use of the 16-acre tract did not appear, and the trial court was fully justified in holding that the zoning ordinance of the city did not prevent the railway from performing its public duties or encroach upon the authority of the State Corporation Commission.

The railway's other contention is that the residential zoning classification which has been assigned to its land is arbitrary and unreasonable and that the zoning ordinance of the city is, therefore, invalid in its application to the tract in question.

Established principles of zoning law control the determination of the question here presented. Such principles were succinctly stated by Mr. Justice l'Anson in *Board of Supervisors* v. *Carper*, 200 Va. 653, 660, 107 S. E. 2d 390, when he wrote:

"The general priniciples applicable to a judicial review of the validity of zoning ordinances are well settled. The legislative branch of a local government in the exercise of its police power has wide discretion in the enactment and amendment of zoning ordinances. Its action is presumed to be valid so long as it is not unreasonable and arbitrary. The burden of proof is on him who assails it to prove that it is clearly unreasonable, arbitrary or capricious, and that it bears no reasonable or substantial relation to the public health, safety, morals, or general welfare. The court will not substitute its judgment for that of a legislative body, and if the reasonableness of a zoning ordinance is fairly debatable it must be sustained. *Board of County Supervisors of Fairfax County* v. *Davis*, 200 Va. 316, 322 106 S. E. 2d 152, 157; *West Bros. Brick Co.* v. *City of Alexandria*, 169 Va. 271, 288, 192 S. E. 881, 888 (appeal dismissed 302 U. S. 658, 58 S. Ct. 369, 82 L. ed. 508, rehearing denied 302 U. S. 781, 58 S. Ct. 480, 82 L. ed. 603). The exercise of the police power is subject to the constitutional guarantee that no property shall be taken without due process of law and where the police power conflicts with the Constitution the latter is

supreme, but courts will not restrain the exercise of such power except when the conflict is clear. *West Bros. Brick Co.* v. *City of Alexandria,* supra (169 Va. at 281, 192 S. E. at 885).

". . . '[T]he purpose of zoning is in general two-fold: to preserve the existing character of an area by excluding prejudicial uses, and to provide for the development of the several areas in a manner consistent with the uses for which they are suited. The regulations should be related to the character of the district which they affect; and should be designed to serve the welfare of those who own and occupy land in those districts.' See also I Yokley, Zoning Law and Practice, § 10, pp. 12, 13."

In line with these concepts are the provisions of the city charter, by the authority of which the city's zoning ordinance was enacted. The charter provides, in part, as follows:

"The regulations and restrictions shall be uniform and shall apply equally to all land, buildings and structures and to the use and to each class or kind thereof throughout each district but the regulations and restrictions applicable in one district may differ from those provided for other districts." (§ 17.11)

"The regulations and restrictions shall be enacted with reasonable consideration, among other things of the character of each district and its peculiar suitability for particular uses and with a view of conserving the value of land, buildings and structures and encouraging the most appropriate use thereof throughout the city." (§ 17.12)

The trial court held that the action of the city in placing the railway's land in a residential classification was not arbitrary and unreasonable but was, instead, directly based upon considerations of public health, welfare and safety. The crucial question is, does the evidence sustain these findings?

At the outset, it should be noted that the evidence before the trial court was in conflict, with the city's witnesses expressing views contrary to those of the railway's witnesses on the essential points relating to the proper zoning of the land. The trial court observed the witnesses and heard them testify. The court was free, as it chose to do, to accept the testimony of the city's witnesses rather than that given by the witnesses for the railway.

The evidence before the trial court showed that the residential area in the neighborhood of the tract in question was one of the most desirable in the city, south of the James; that to implant in such an area the operation proposed by the railway, with its accompanying

danger, undesirable noise and unpleasant view, would depreciate the value of the nearby residential property, curtail its enjoyment and introduce into the area an inharmonious use.

The evidence further showed that the planning and development of the parkway and parks along the southern shore of the James had been in progress for many years, implemented by all of the zoning ordinances enacted since 1927 and given real force by the 1946 master plan, adopted by the city, which stated that, "property lying between the [Riverside] drive and the river should be brought under public control in order to protect this property from uses which might be detrimental to use of the drive for pleasure driving." It was made clear that diversion of the railway's land to an industrial use would, at the same time, disrupt the planning of decades which envisioned use of the very tract in dispute as an integral part of the city's park system.

And, lastly, the evidence established that the zoning action of the city was not directed to any specific tract but to an entire zoning district, integrated into an overall plan for the development of the city, in accordance with the provisions of §§ 17.11 and 17.12 of the city charter.

All of this demonstrates, in our opinion, the correctness of the trial court's finding that the railway's land had not been arbitrarily and unreasonably zoned.

But, the railway argues, the zoning action of the city unlawfully renders its land valueless because it assigns the land to a classification which only permits uses to which the land cannot physically be put.

Here, the railway cites and relies upon the rule that, "zoning cannot render private property valueless." 8 McQuillin, Municipal Corporations, § 24.45 (3d ed. 1957). Quoting further from McQuillin, the railway says that, "If the application of the zoning ordinance has the effect of completely depriving the owner of the beneficial use of his property by precluding all practical uses or the only use to which it is reasonably adapted, the ordinance is invalid."

The railway states that it, "recognizes that it has the burden of proving that the Property is not reasonably adaptable to any of the uses permitted by § 39.12 of the Zoning Ordinance." It insists, however, that it, "established unequivocally that the Property could not be used for any of the purposes" permitted by the zoning ordinance.

Section 39.12 of the city zoning ordinance, in addition to per-

mitting, in R-1, R-2 and R-4 residential districts, rights-of-way and easements for public transportation and for public utilities, also permits, among other things, single family dwellings and public and private parks and recreational areas.

The trial court, in its written opinion, properly held that the railway had proved conclusively that the tract in question was not adaptable to use for single family dwelling purposes. The focus of the opinion was then directed to whether the railway had shown that the tract was not adaptable to public and private park and recreational purposes. The court concluded that not only had the railway failed in this respect but that the city had, on the other hand, proved that the tract was practically adaptable to public park use. Further, the court held that the tract was peculiarly adaptable to use as a private, non-commercial area for boating, fishing, water-skiing, etc.

We are of the opinion that the evidence sustains the findings of the trial court in this connection. In addition to the evidence which has already been recited relating to the city's planning for parkway and parks in the area involved, the city's witnesses said of the proposal for a park on the tract that, "there is a very great need for a park of this kind in the city . . . this particular stretch is unique and it is in the heart of Richmond and has tremendous recreational potentialities which any other city would be most jealous of . . . this would be an ideal area for park development, with the river as part of the park . . . it would be about the heart" of an extended park or parkway along the river.

It was also disclosed that the tract in question abounded in wild-life and botanical specimens and, to the delight of the fisherman, that the river in the area of the tract, "is one of the best small-mouth bass streams in the state."

The evidence further showed that the existing park areas of the city were far less than required by accepted planning standards; that the tract in question would provide the site for, "a naturalist park—a type of park which the city needs very much" and that there was no, "other land similarly situated which the city could use for such a purpose" on the bank of the James, "except further upstream."

The railway attempts to discredit the suitability of the tract for park purposes by asserting that access thereto could be had only by way of a grade crossing over its right-of-way, which it says it is unwilling voluntarily to grant. But this does not destroy the suitability of this land for these purposes. In the first place, the city's experts

in park planning said that, as incidental to development of Riverside Drive, the scenic value of the tract would not be diminshed by the lack of access. Further, it is inconceivable that if the railway sold the land to a private group for development as a recreational area, it would not, as a part of its sale, also provide access thereto. And, if the city should be successful in its efforts to acquire the tract, it would have the right to proceed under the provisions of Code, § 25-233 to secure permission of the State Corporation Commission to institute condemnation proceedings to provide proper access to the land.

 Finally, the railway says that even conceding the adaptability of the land to park and recreational purposes, this does not justify the assignment of the land to a residential classification. Here, the railway argues that the zoning for such purposes relegates it to the position of owning property for which there is only one purchaser, the city, and that since the latter, "has not attempted to acquire the Property" for park purposes, "even though it has been so zoned since 1927, the limitation which it has placed upon the land is unlawful, confiscatory and must be invalidated."

The railway cites numerous cases in support of its position, a discussion of which would unnecessarily extend the length of this opinion. Suffice to say that the factual propositions presented in those cases are so substantially different from the situation now before us as to make the decisions unpersuasive here.

The key point in this case, which renders the railway's position without merit, is the long history of the city's planning, acquisition and development of land in the area for parkway and park purposes, culminating in the ordinance of January 9, 1961, directing the acquisition by the city of the tract in dispute.

The railway asserts that the acquisition ordinance was but mere, "window dressing, adopted by the City in an effort to shore up what Southern contends to be the vulnerable Ordinance of December 12, 1960," the amendment to § 39.12 of the zoning ordinance.

The trial court held that the December 12, 1960, ordinance was merely definitive of the June 1, 1960, zoning ordinance which, if otherwise valid, prohibited the use of the land as proposed by the railway. The railway, on appeal, does not attack this ruling of the court. The December, 1960, ordinance, then, needed no "shoring up" and there is nothing in the record to indicate that the January 9, 1961, ordinance was "window dressing," or anything other than the

valid granting of authority to carry out the city's long-expressed intention to acquire the tract. Nor is there any evidence in the record to assail the city's statement that it, "is ready, willing and able to acquire the property at a fair price."

Under these circumstances, the application of the zoning ordinance to the land of the railway is not confiscatory. The only result is that the railway will not be permitted to put the land to the use it desires, a result which is not unusual or unexpected when the wishes of a property owner run counter to the provisions of a valid zoning ordinance.

The trial court made an inspection of the area involved, conducted lengthy hearings and gave consideration to the arguments and citations of authority of the litigating parties. The court's able and comprehensive written opinion displays full knowledge of the evidence, a complete grasp of the issues involved and a thorough understanding of the applicable law. The court's decision is presumed to be correct and the burden is upon the railway to establish the error therein. This the railway has failed to do. Accordingly, the decree appealed from will be

*Affirmed.*