**J. CARUTHERS et al., Appellants,**

v.

**BOARD OF ADJUSTMENT OF THE CITY OF BUNKER HILL VILLAGE,**
Appellee.

No. 12969.

Court of Civil Appeals of Texas.

Galveston.

April 19, 1956.

Rehearing Denied May 17, 1956.

McGregor & Sewell, Houston, Burke M. Martin and Ben G. Sewell, Houston, of counsel, for appellants.

Paul Strong and Tom S. Gillis, Houston, for appellee.

GANNON, Justice.

This case involves the validity as applied to appellants of the minimum home-site area requirements of a zoning ordinance of the City of Bunker Hill Village, a municipal corporation organized under general law. Bunker Hill Village is essentially a residential community. It is located in the Memorial Drive area southwest of Houston. The city was incorporated December 20, 1954. Approximately four months later, and on April 29, 1955, the zoning ordinance involved was enacted. By the ordinance, the entire city is constituted one district for zoning purposes limited to single family dwellings, churches, schools, libraries, governmental buildings, parks, playgrounds, non-commercial farms, nurseries, truck gardens, and telephone exchanges. There are regulations establishing building areas, yard requirements, and limiting the height of buildings. The placement of signs and billboards is also regulated. There are visibility restrictions and an express prohibition of the use of any land for cemetery purposes. The ordinance contains the usual provisions protecting, but limiting the extension of, existing non-conforming uses and permits the completion of construction in progress.

The parties treat the ordinance as requiring, subject to exceptions, minimum homesite areas of not less than 40,000 square feet and as requiring application for and issuance of building permits by the planning and zoning commission. The ordinance expressly provides for a board of adjustment, with power, subject to appropriate conditions and safeguards, to make exceptions to and grant variances from the terms of the ordinance in harmony with its general purpose and intent so as to balance private and public equities and to avoid unconstitutionality in the application of the ordinance to particular cases involving insupportable hardship, damage and injury.

Section 3B of the ordinance reads as follows:

"B. Required Lot Area and Width:

"(1) The lot areas of any proposed division, subdivision, or addition shall be not less than 40,000 square feet in area,

exclusive of public or private roads, unless such lot or tract existed as a separate lot or tract of smaller size, on the date of passage of this ordinance, platted and recorded in compliance with Article 974a, Vernon's Annotated Civil Statutes of the State of Texas.

"(2) The Board of Adjustment may, after hearing grant a special exception to the above requirement, only under one of the following conditions:

"a. If the proposed lot or tract of land upon which each dwelling is to be constructed is served by adequately designed water and sanitary sewer systems, and approved by the proper health authority of this city, and both such water and sanitary sewer systems are adequate in size and capacity to serve at least all of the lots or tracts within a proposed new subdivision of which such lot shall be a part; or

"b. If the proposed lot or tract of land is contiguous to and adjoins, with no intervening public or private road, a subdivision plotted and recorded in compliance with Article 974a, Vernon's Annotated Civil Statutes of the State of Texas as of the date of passage of this ordinance, and the average size of the lots or tracts within such existing subdivision is less than 40,000 square feet, then the Board of Adjustment may approve lots or tracts in the proposed subdivision of a size not smaller than 150% of the average size of such lots in the existing subdivision; but all such lots of size smaller than 40,000 square feet which are approved under this exception must be in their entire area within 400 feet of the nearest boundary of such existing subdivision; or

"c. If the proposed subdivision into lots or tracts of land upon which each dwelling is to be constructed did not exist as a separate lot or tract plotted and recorded in compliance with Article 974(a), Vernon's Annotated Civil Statutes of the State of Texas, as of the date of passage of this ordinance, but the owner of such property on the date of passage of this ordinance can show, by suitable documentary evidence, such as valid earnest money contracts, or by dated surveyors plats, or other documentary evidence, that substantial preliminary work had been done or valid legal obligations created with reference to smaller tracts of land, prior to February 10, 1955, which was the date of passage of the temporary building permit ordinance by the City Council of this City, then the Board of Adjustment, by unanimous vote, may grant an exception to the above requirement; However, this exception shall expire on August 10, 1955, and shall cease to be an exception for applications or plats submitted after that date.

"(3) In no event may the Board of Adjustment grant an exception to paragraph (1) of this section if the proposed lots or tracts in any such new subdivision contain less than 20,000 square feet, exclusive of public or private roads."

The precise question before us is whether the appellants, under the undisputed facts, are entitled to building permits authorizing the construction of single family dwellings on some 13 lots in Blalock Forest Subdivision as platted. None of these lots contains an area of 20,000 square feet. Two of the 13 lots have an area of 18,750 square feet; the remaining 11 have an area of 15,000 square feet.

There are no procedural points involved. After exhausting their administrative remedies, appellants properly sued the city's board of adjustment by certiorari under the provisions of art. 1011g, V.A.T.S., for a judicial determination that the building site area requirements of the zoning ordinance were not applicable to appellants' property, or if they were, that, as applied to appellants, such restrictions were unconstitutional and void. Appellants were denied relief in the trial court.

Appellants do not in anywise question the constitutionality of the zoning ordinance generally, nor its requirement of minimum homesite areas. Apparently they concede all provisions of the ordinance to be valid when operating prospectively, but appellants do insist that the minimum area requirements of the ordinance are invalid

and unconstitutional if held to apply to them on the facts presented by the record.

We have no doubt that minimum area requirements are supportable when reasonably necessary for the protection of the public safety, health, morals or general welfare. See Simon v. Town of Needham, 311 Mass. 560, 42 N.E.2d 516, 141 A.L.R. 688; De Mars v. Zoning Commission, 19 Conn.Sup. 24, 109 A.2d 876; Fischer v. Bedminster, 21 N.J.Super. 81, 90 A.2d 757; Franmor Realty Corp. v. Village of Old Westbury, 280 App.Div. 945, 116 N.Y.S.2d 68; Dilliard v. Village of North Hills, 276 App.Div. 969, 94 N.Y.S.2d 715; Flora Realty & Investment Co. v. City of LaDue, 362 Mo. 1025, 246 S.W.2d 771; Lombardo v. City of Dallas, 124 Tex. 1, 73 S.W.2d 475, 478.

Before stating the facts and as an aid to a ready appreciation of their materiality, we notice the legal status, under existing decisions, of zoning generally.

In Lombardo v. City of Dallas, supra, the Supreme Court, in an exhaustive opinion by Judge Cureton, upheld the constitutionality of zoning. The court, as indeed was necessary to reach the result arrived at, overruled as having been long since determined adversely to the petitioner his "insistence that the right of property or the unrestricted use of property is not subject to the police power". Contemporaneously with the decision of the Lombardo case, the Supreme Court decided McEachern v. Town of Highland Park, 124 Tex. 36, 73 S.W.2d 487. There the Supreme Court approved the disposition made by the El Paso Court, Tex.Civ.App., 34 S.W.2d 676, of plaintiff's insistence that because he had applied for a permit and filed a suit upon its refusal before zoning, the ordinance there involved could not be retroactively or retrospectively invoked against him. The ruling of the El Paso court appears from the following:

"This suit was filed about 30 days prior to adoption by the town of Highland Park of the zoning ordinance in question.

"Appellant contends that his right to the building permit attached prior to the adoption of the ordinance and the ordinance could not retroactively destroy his right to the permit and to use his land for the purpose indicated.

"This is without merit. All property is held subject to the lawful exercise of the police power. 6 R.C.L. p. 193, § 192."

There are numerous out-of-state authorities which appear to hold that zoning ordinances outlawing existing non-conforming uses are unconstitutional and void, some under state constitutions, such as that of Texas outlawing retroactive legislation, others under constitutions protecting only against deprivation of property without due process of law. Some of these decisions, of which Darlington v. Board of Councilmen of City of Frankfort, 1940, 282 Ky. 778, 140 S.W.2d 392, 396, is illustrative, seem to indicate that the actual use of property for a particular purpose vests in the owner a right higher than that inherent in mere ownership, absent actual devotion to use. In the Darlington case, it was said:

"It would seem, therefore, that the right to utilize one's property for the conduct of a lawful business not inimicable to the health, safety, or morals of the community, becomes entitled to constitutional protection against otherwise valid legislative restrictions as to locality, or, in other words, becomes 'vested' within the full meaning of that term, when, prior to the enactment of such restrictions, the owner has in good faith substantially entered upon the performance of the series of acts necessary to the accomplishment of the end intended." Cassel Realty Co. v. City of Omaha, 1944, 144 Neb. 753, 14 N.W.2d 600; Baker v. Somerville, 1940, 138 Neb. 466, 293 N.W. 326; State ex rel. Schroedel v. Pagels, 1950, 257 Wis. 376, 43 N.W.2d 349, are in apparent accord with the Darlington case. We feel, however regardless of some of the language of these opinions, that so far as the result of these cases is supportable, it must rest on the proposition that under the facts involved, the Kentucky, Ne-

braska, and Wisconsin courts actually considered the exercise of the police power involved in those cases unreasonable and therefore a denial of due process of law.

■ That so-called retroactive legislation is not intrinsically and per ,se void even in the face of seeming express constitutional guaranties against it is very generally held. See 16 C.J.S., Constitutional Law, § 416, p. 859. The gist of the text is that it is commonly held, even under express provisions against the enactment of retrospective laws as such, that not all laws retrospective or retroactive in their nature or operation come under the constitutional condemnation and that since retroactivity is not objectionable per se, the validity of a retrospective statute is to be determined by its effect; that is to say, whether in operation it is subject to some other fundamental objection such as being violative of due process or partaking of the nature of an ex post facto law.

The cited Kentucky, Nebraska, and Wisconsin authorities tend to illustrate the rule. The Darlington case expressly indicates that actual use of property does not vest the right to continue that use in a manner "inimicable to the health, safety, or morals of the community," and, in the Pagels case from Wisconsin the result reached is supportable on fact findings "to make the rezoning [there involved] arbitrary and unreasonable." [257 Wis. 376, 43 N.W.2d 352.] On analysis, we feel that fundamentally all of the authorities on the validity of zoning restrictions turn on the due process clause which protects against arbitrary and unreasonable exercise of the police power, since all property and all property rights are held subordinate to the valid and reasonable exercise thereof. Rodee v. Lee, 1951, 14 N.J.Super. 188, 81 A.2d 517.

It is difficult to see how the mere non-exercise of a right of property can cause the loss of that right, or how its exercise can cause the right to emerge paramount to the police power. We say this in full recognition that Brown v. Grant, Tex.Civ. App., San Antonio, 1928, 2 S.W.2d 285, no

writ history, would appear to be in conflict and has often been cited both within and without the State in support of that theory. Nevertheless, we consider the question an open one in Texas in the light of the refusal of our Supreme Court, in City of Corpus Christi v. Allen, 1953, 152 Tex. 137, 254 S.W.2d 759, 761, to hold outright that the ordinance there involved, which prohibited existing uses, was unconstitutional and void. In that case, the Supreme Court held the ordinance void in its application to Allen because unreasonable as applied to Allen's non-conforming use, but was careful not to be taken as holding the ordinance invalid per se as destructive of non-conforming existing uses. The court concluded its opinion as follows: "Our conclusion is not to be construed as a holding that the ordinance in question may not, under other circumstances, be invoked to terminate a non-conforming use, not a nuisance nor injurious to the public health, morals, safety or welfare."

For cases considering the constitutionality of retroactive zoning legislation, see the annotation of 86 A.L.R. 684, considering and collating City of Lansing v. Dawley, 1929, 247 Mich. 394, 225 N.W. 500, and other cases. A zoning ordinance expressly prohibiting existing uses was upheld in State ex rel. Dema Realty Co. v. McDonald, 168 La. 172, 121 So. 613, and State ex rel. Dema Realty Co. v. Jacoby, 168 La. 752, 123 So. 314. The Federal Supreme Court denied certiorari in both cases.

Though our views are contrary to those expressed in Brown v. Grant, supra, we consider them to be in line with the more authoritative case of Houston & T. C. Ry. Co. v. City of Dallas, 1905, 98 Tex. 396, 84 S.W. 648, 70 L.R.A. 850. In City of West University Place v. Ellis, Tex.Com.App. 1940, 134 Tex. 222, 134 S.W.2d 1038, 1041, the court drew a principle applicable to zoning legislation from Houston & T. C. Ry. Co. v. City of Dallas. There the court said: "This principle is that if the attempted protection to the public involves an oppressive loss to the property owner, and the protection afforded appears to be doubtful

or inconsiderable, the ordinance will not be sustained. For instance, in said case the Court said: 'If it be true that there is to be no benefit to the public from the proposed change, or a benefit which is inconsiderable when compared with the detriment to be suffered by the respondent, who will say that it is just and reasonable to subject respondent to such expense and loss as is averred?'" In this connection, see Nelson v. State, 1918, 167 Wis. 515, 167 N.W. 807, upholding as against a claim of retroactivity Wisconsin's Tenement House Act, Laws of 1909, c. 394, prohibiting the further use as a tenement of a certain building owned by defendant Nelson which he had theretofore devoted to such purpose. Nelson's tenement failed to comply with the requirements of the Act because it contained basement rooms used for living purposes with ceilings less than 4 feet above the level of the lot. The legislation was upheld as a reasonable, though retroactive, exercise of the police power in the interest of public health.

In passing, we note that zoning ordinances have been attacked as denying equal protection of the laws because of exempting non-conforming existing uses from their operation, and as denying due process because not exempting existing non-conforming uses from their operation. Both grounds of attack have been rejected. See 58 Amer.Jur., Title "Zoning," Secs. 147 and 148, Page 1021 et seq.

██ Our conclusion is that the right of ownership in tangible property necessarily includes the right of any lawful or legitimate use, whether or not fortified and ripened by devotion to such use, but that such right of use is ever subject to the legitimate exercise of the police power. It is also our belief that, under the authorities, short of actual taking for public use, legislation regulatory of the use of property pursuant to the police power is to be sustained regardless of even severe hardship in particular cases whenever the public health, safety, morals or general welfare outweigh the equities of the individual property owner. Houston & T. C. Ry. Co. v. City of Dallas, supra, is illustrative of this view. As typical of numerous out-of-state authorities, see Marblehead Land Co. v. City of Los Angeles, 9 Cir., 47 F.2d 528. There land worth $10,000 per acre for residential purposes was zoned against oil development. In the opinion of experts, the same land would be worth millions for oil production. The land had been leased by the owner to Standard Oil Company for a bonus of $65,000 and the latter had expended $136,000 preparing to prospect for oil, including the erection of a derrick on the land. The ordinance was upheld as a reasonable exercise of the police power and the actual $136,000 out-of-pocket loss and the loss of value of the land for oil were held to be damnum absque injuria. Our Federal Supreme Court has designated such hardships as only "a part of the social burden of living." Such euphemisms and the results reached in some of the cases point up the necessity of the courts scrutinizing very closely the facts in particular cases. The result reached in Marblehead Land Co. v. City of Los Angeles, supra, impresses the writer as unjust, but that is not because of the principles there announced but because of their application. If courts are zealous not to permit fancy to override fact, there is no reason why zoning and legitimate property interests may not co-exist without undue hardship either to the public or private citizens.

██ We do not wish to be understood as implying that the prior existence of a non-conforming use is not a factor of great weight. The fact that most zoning ordinances permit the continuance of such uses constitutes widespread legislative recognition, we think, of the importance to be given such a use in balancing private against public equities. Undoubtedly in many situations a prior existing non-conforming use may very well constitute the deciding element in arriving at the end result. But this is still somewhat short of saying that a prior existing use is in every case alone and without more to be given controlling effect.

■ The proper application of another principle is raised by the facts, and that is that zoning ordinances providing for exemption of non-conforming uses are now quite generally held to contemplate non-conforming uses actually existing as distinguished from the acquirement or setting apart and dedication of property in contemplation of future use. See 62 C.J.S., Municipal Corporations, § 226 (19) (b), non-conforming uses, p. 496; City of Harrisburg v. Pass, 1953, 372 Pa. 318; 93 A.2d 447; West Bros. Brick Co. v. City of Alexandria, 169 Va. 271, 192 S.E. 881; and Fairlawns Cemetery Association, Inc., v. Zoning Commission of Town of Bethel, 1952, 138 Conn. 434, 86 A.2d 74.

In City of Harrisburg v. Pass, supra, the complaining party had paid out in advance of the passage of the ordinance there involved $3,380 in architect's fees for plans for a proposed building and for a survey of land for use as a tourist court. Addressing itself to the contention that the facts showed an existing use, the court said [372 Pa. 318, 93 A.2d 450]:

"There is no merit in defendants' argument that their property qualifies as a non-conforming use under section 17(d) (1) of the ordinance, which provides that a non-conforming use in existence at the time of the adoption of the ordinance may be continued subsequently. There was no use of any kind in existence when the ordinance was adopted; clearly, the mere fact that a particular use may have been in the contemplation of the owners would not bring the property within the coverage of the section in question; (cf. Appeal of Dunlap, 370 Pa. 31, 33, 34, 87 A.2d 299, 301)."

In the Fairlawns Cemetery Association case, a dedication of property for cemetery purposes, which the owners had proceeded to improve for cemetery use, was held, in the absence of burials, not to constitute an actual non-conforming use. The court said [138 Conn. 434, 86 A.2d 79]:

"To come within the provisions of the zoning regulations relating to nonconforming uses, the use must be actual. It is not enough that it be a contemplated use, even though plans for that have been put on paper. 8 McQuillin, Municipal Corporations (3d Ed.) p. 375, § 25.188; 58 Am.Jur. 1023, § 152; see Lehmaier v. Wadsworth, 122 Conn. 571, 575, 191 A. 539. It is not enough that the property was bought for the particular purpose. West Bros. Brick Co. v. Alexandria, 169 Va. 271, 284, 192 S.E. 881; 8 McQuillin, op. cit., p. 376. We said on this subject in DeFelice v. Zoning Board of Appeals, 130 Conn. 156, 161, 32 A.2d 635, 637, 147 A.L.R. 161; 'In the ordinance quoted remitting the continuance of "any non-conforming use existing," as was pointed out by the court in considering a similar enactment in Pennsylvania, "neither the extent, quantity, nor quality of the use is mentioned, but only that it must exist," and "neither the act, the ordinance, nor the law generally requires the court to speculate as to the number of acts or business transactions necessary to constitute an existing use," but, "as understood in the ordinance, 'existing use' should mean the utilization of the premises so that they may be known in the neighborhood as being employed for a given purpose." Haller Baking Co.'s Appeal, 295 Pa. 257, 261, 145 A. 77.' "

### Facts.

Appellant Caruthers owns Blalock Forest Subdivision in its entirety. The proposed subdivision lies wholly within the corporate limits of Bunker Hill Village. Blalock Forest contains 12.09 acres. Of this acreage plaintiff owned 1.19 acres prior to the incorporation of the city. He contracted to purchase the remaining 10.9 acres on November 26, 1954, for a purchase price of $55,000. The purchase contract also antedated the city's incorporation but the deed was not delivered until January 11, 1955, after its incorporation on December 20, 1954. Under arrangements with his vendor, Caruthers entered upon the property in November of 1954, one month before the city was incorporated and five months before the enactment of the zoning ordinance in question. In November of 1954, arrangements were made to survey the property for the purpose of platting it into 23 separate lots or building sites

as a residential subdivision. Caruthers planned to develop the property in accordance with such a subdivision. The survey was begun December 4, 1954, and completed early in January of 1955. Wooden stakes marking lot corners, which were placed in December of 1954, were replaced with iron pins in January of 1955. The survey field work was completed January 8, 1955. A map or plat of the survey, indicating the area of each building site or lot, was completed February 5, 1955. In December of 1954, Caruthers commenced the construction of the single street contemplated for the property. This divides the property into two irregular shaped blocks. A shell top was placed on the street and concrete curbings placed along both sides for a total length of 2,300 lineal feet. By not later than January 10, 1955, a concrete culvert had been placed for the entrance to the proposed subdivision and two brick columns were constructed thereat to mark the entranceway. Contemporaneously a sign with the words "Blalock Forest" was placed at the entrance. About the same time, a water line was laid down the south line of the proposed subdivision consisting of 2,500 feet of 2 inch and 2½ inch pipe. Previously a water well had been drilled on the south property line of Blalock Forest which adjoined Caruthers' Green Oaks Subdivision. This well was expected to serve both subdivisions. Between March 15th and 24th of 1955, United Gas Corporation laid a 2 inch gas line to serve the subdivisions. This was at the utility's expense. Prior to this work, the gas corporation had been furnished with a plat of the proposed subdivision and the gas company had assigned tentative street numbers to each of the 23 building sites as they appeared on the plat. The numbering conformed to the general numbering system used in the area for street or house numbers. As early as January of 1955 signs were placed on the property indicating it was for sale. The property was shown to prospective purchasers and lots were offered for sale upon the representation, express or implied, that the subdivision would be developed as shown on the plat. However, there is a finding by the trial court that no lot or lots had been sold by appellant Caruthers prior to the adoption of the zoning ordinance and that up to and including the time of the enactment of the zoning ordinance, the ownership, legal and equitable, in its entirety, of Blalock Forest Subdivision, was in appellant Caruthers. Caruthers contends to the contrary and attacks this finding of the court, but represents that the existence of bona fide sales of lots to one or more persons would be immaterial and we do not further concern ourselves with the question of the ownership of the various lots in the property, but treat the title, legal and equitable, to the entirety of the subdivision as in appellant Caruthers up to the enactment of the zoning ordinance.

If appellant Caruthers is denied the privilege of separating the particular area of the subdivision which is involved into 13 separate homesites, he will not be caused thereby to lose any part of his actual investment in the property, but by reason of having to plat the area into 9 lots rather than 13 lots will not be able to sell it for as much profit as he could were he permitted to continue with his plan to subdivide the area into 13 separate building sites. It is feasible but not as profitable to divide the questioned area into 9 homesites rather than 13 separate lots.

The city of Bunker Hill Village has no central water supply, no sanitary sewers; nor does it have a storm sewer system. There is no organized fire department. The city's water supply comes from wells and its sewage disposal is by septic systems on the homesites. The soil does not rapidly dispose of sewage. Prior to the enactment of the zoning ordinance, on April 29, 1955, no residence or other structural improvements had been erected upon any of the area in dispute and no party was actually using any part of the area for residential purposes.

On July 7, 1955, appellant Schreiber applied for a building permit on one of the 15,000 square foot lots in dispute. On July 22, 1955, appellant Caruthers made application for a similar permit on a site consisting of 22,020 square feet. Both applica-

tions were refused. On August 3, 1955, Caruthers appealed to the Board of Adjustment on his own behalf and on behalf of Schreiber and others to whom Caruthers claimed he had sold or to whom he proposed to sell lots. On September 2, 1955, the Board of Adjustment entered an order granting Caruthers a permit to build on the 22,020 square foot site and granting him the right to build on other lots in Blalock Forest having an area of 20,000 square feet or more. The application for a permit to build on the 15,000 square foot lot was denied by the Board. By this order, the Board granted an exception authorizing the issuance of building permits on all lots in Blalock Forest Subdivision having an area in excess of 20,000 square feet, but denied an exception in respect to all lots having an area of less than 20,000 square feet. Of the 23 lots plotted for the addition, 10 contain more than 20,000 square feet, 13 contain less.

None of the lots in question lies within 400 feet of any subdivision platted and recorded in accordance with Article 974a, V.A.T.S., and there is no such subdivision in the vicinity of Blalock Forest.

The appellants do not attack findings of the trial court as follows:

"17. There is less hazard of fire spreading from one house to another on lots having a minimum of 20,000 sq. feet than there is on lots having a minimum of 15,000 sq. feet.

"18. The use of septic tanks for sewage disposal is contemplated on the Blalock Forest lots in question. Lots having a minimum area of 20,000 sq. feet tend to have less health hazard from the use of septic tanks than do lots of minimum of 15,000 sq. feet, the former providing larger areas for evaporation.

\* \* \* \* \* \*

"22. The part of Blalock Forest subdivision in question is suitable in all respects for residence use, as it is zoned, and all improvements put in by petitioner Caruthers could be used in connection with lots having a minimum area of 20,000 sq.

feet as well as on lots having a minimum area of 15,000 sq. feet as platted."

Other findings of the trial court not attacked by appellants established the existence of substantial evidence to support the following: The costs to Caruthers of the various steps taken by him in connection with his Blalock Forest subdivision were: Surveying and platting $560; Road construction, $2800; Installation of gates, $590; Installation of water lines, $2,000; Cost of sign "Blalock Forest," $12; Allocable cost of well improvements and tanks properly assignable to Blalock Forest, $2,850; Cost of gas and electric lines, $-0-.

There were no other costs incurred by Caruthers in connection with preparation of Blalock Forest for use as a residential subdivision other than above. Most homesites within the limits of Bunker Hill Village comprise more than one acre of land. Since the passage of the zoning ordinance in question, all lots in Blalock Forest having an area in excess of 20,000 square feet have been sold. If the remaining portion of Blalock Forest is divided into lots having a minimum of 20,000 square feet each, Caruthers will make a substantial profit on such lots although not as much profit as if he were free to utilize the area for building sites containing only 15,000 square feet each.

The trial court found additionally that the minimum lot area requirements of the zoning ordinance bear a reasonable relation to public health, safety, and general welfare of the City of Bunker Hill Village.

It is undisputed that no plat of Blalock Forest Subdivision has ever been recorded, in compliance with Article 974a, V.A.T.S., or Article 6626, V.A.T.S. Presumably all lot sales were made by a metes and bounds description so as to avoid violation of Article 1137h of the Penal Code.

Appellants base their appeal on substantially the following points:

1. The steps taken, work done, and expenses incurred by Caruthers prior to the enactment of the zoning ordinance vested in him a right to recognition by the city

of the lot lines of Blalock Forest as platted so that the application of the ordinance to the lots in question is retroactive and unconstitutional as denying a vested right to use the separate areas for residential purposes. This is bottomed on Sec. 17, art. I of the Texas Constitution, Vernon's Ann. St., denying the right to take, damage or destroy private property for public use without adequate compensation being first made.

Appellants do not cite Sec. 16, art. I of the Constitution, prohibiting retroactive laws, nor do they cite either the due course of law of the land provision of the State Constitution or the due process clause of the 14th Amendment to the Federal Constitution. However, their point, as made, is broad enough to include any relief to which they are entitled under these provisions.

2. The undisputed evidence established in appellants a non-conforming use within the meaning of the word "use" as it appears in the Texas zoning statutes and the ordinance in dispute; and it was error for the trial court to hold that the facts established only preliminary matters preparatory to the use of the disputed area for residences since appellants' showing established as a matter of law a separate and distinct use of the area "for selling off of a subdivision" entitling appellants to building permits on all separate areas delineated on its unrecorded plat.

3. In denying appellants' exceptions to the ordinance so as to prevent them from using lots containing less than 20,000 square feet as residential building sites, the Board under the undisputed facts acted arbitrarily and capriciously, and its action constitutes an abuse of discretion, if it had any under the ordinance to grant the exceptions sought.

### Opinion.

We overrule all of appellants' points.

■ We are unable to hold that the facts establish in appellants any vested right to compel recognition by the city of the lot lines of Blalock Forest subdivision as platted by appellants. Appellants' claim

that the platting constituted a division or subdivision is of doubtful validity. We apprehend that from the platting alone there did not flow any legal division or subdivision of the area in dispute. Such division or subdivision would not flow from a mere platting but only from an actual divestiture of title to some one or more of the lots shown on the plotted area. In legal contemplation, there cannot be a division or subdivision of an area so long as the title to the whole of it remains in the same person and that person remains free, as did Caruthers up to and including the time of the enactment of the zoning ordinance, to replat and replan the use of the entire acreage involved for residential or other purposes in areas of different sizes, larger or smaller, as he might desire. Under the facts, Caruthers had not divested himself of title to any part of the area in dispute prior to the zoning ordinance, nor had he irrevocably dedicated any part of it to public use.

■ If we be wrong in the foregoing, we nevertheless feel that even an actual division or subdivision of the property by reason of sales would not place it beyond the authority of the city to regulate under the police power provided such could be done without undue private hardship or loss, measured in relation to the public benefit of such regulation. We are of the view that it is competent under the police power for the city to prohibit, when reasonable or necessary for the preservation or advancement of the public health, safety, morals, or general welfare, even existing non-conforming uses when this can be done in the light of conflicting public and private equities which do not weigh clearly in favor of individual property owners.

■ Here, in view of public health and safety factors apparent from the findings of the trial court, we are unable to see as applied to appellants any unwarranted or unreasonable exercise of the police power by the city in its insistence on the minimum area provisions of the ordinance as modified by the Board of Adjustment. If enforced, appellants' investment is left

intact. He will even realize some increment on his investment though admittedly not as much as he otherwise might obtain. We feel that the operation of the ordinance in denying appellant the full gain and profit which he had hoped to make from his investment and efforts is in no sense oppressive or outrageous. If, as the cases clearly indicate, all tangible property is held subject to the legitimate exercise of the police power, appellants have no just grounds for complaint when, by being required to conform to the ordinance their property will be used in a manner which will tend to protect their fellow citizens from fire and health hazards, and this without any actual loss of investment; and when actually appellants will realize from their investment and labors a profit which they do not even claim to be unreasonably low in relation to their contribution to the enterprise of capital, time, effort and skill. If it can be said in any view that the ordinance is retroactive as to appellants, then the answer is it is not unconstitutionally so unless it deprives appellants of some vested right in property paramount to the public's right of self defense under a non-oppressive, non-confiscatory exercise of the police power. In our view, no such property right can exist. Every citizen holds all his tangible property and all rights therein subject to the proper exercise of the police power, and this power cannot be bartered away even by public authority under solemn contract. Much less can any estoppel arise against the public from delay in its exercise. The power may never be used unreasonably nor beyond legitimate and defensible purposes; nor can it ever be used as a cloak for what is actually but the taking of private property for public use. On the other hand, no right to the use or disposal of the property ever vests or can vest in private citizens to insulate them against the police power reasonably applied.

We hold under the facts that the enforcement of the ordinance as to appellants and their property does not constitute retroactive legislation in the constitutionally prohibited sense; and we base this on the proposition that private ownership of tangible property, regardless of the use to which the property may be devoted, is held subject to the reasonable exercise of the police power.

■ We come now to appellants' claim that the undisputed facts established in appellants a non-conforming use within the meaning of the ordinance permitting continuance of existing uses. Section 7A of the ordinance relied on by appellants is as follows:

"*Section 7—Non Conforming Uses:*

"A. Existing at Time of Enactment of Ordinance:

"The use of any building or land existing at the time of enactment of this ordinance may be continued subject to such regulations as to the maintenance of the premises and conditions of operation as may in the judgment of the Board of Adjustment, be reasonably required for the protection of adjacent property."

■ Independently of other provisions of the ordinance, we are convinced under such authorities as City of Harrisburg v. Pass, supra, and Fairlawns Cemetery Association, Inc., v. Zoning Commission of the Town of Bethel, supra, that appellants failed to demonstrate an existing non-conforming use within the meaning of that term as used in Section 7 of the ordinance even when that section is regarded in isolation; however, when we consider Section 7 in pari materia with Section 3B (2) c it is abundantly plain that appellants' preliminary work, albeit substantial, in preparing the area in dispute for residential use, including the platting, did not constitute such an existing use as is contemplated by Section 7 of the ordinance. It would be a plain inconsistency for the ordinance to permit an exception on the basis of "substantial preliminary work" including platting as provided in Section 3B (2) c if, as contended by appellants, such preliminary work, even absent actual use of the property for residential purposes, be sufficient to bring the property within the terms of Section 7A. We fail to see in the enactment the legislative intent contended for by appellants. The contention, if sus-

tained, would constitute Section 3B (2) c mere surplusage. Such construction would run counter to those canons which require us to presume the legislative had in mind some purpose in including in the enactment every word, phrase and sentence of the ordinance.

As to appellants' contention that the evidence demonstrates an abuse of discretion by the Board of Adjustment, if any it had, we see no reason to doubt that Section 3B (2) c of the ordinance vests in the Board of Adjustment discretionary power after hearing and on unanimous vote to grant special exceptions to the 40,000 square foot area requirement in situations akin to that in which appellant Caruthers finds himself; however, there is nothing in the power granted which demands the allowance of an exception in all cases. In fact, we believe the power to be not an arbitrary or personal discretion but a quasi-judicial one to be exercised only in the light of the equitable principles announced in City of West University Place v. Ellis, supra. In the trial court appellants made no effort to demonstrate a case of severe hardship and injury such as would be insupportable even when weighed against considerations of public health and safety. On the other hand, appellants seem to have based their case on the downright legal proposition that since the ordinance, if applied to them, would result in their loss of "some" profit, the enactment was, as to them, unconstitutionally retroactive and void. In any event, we find in the record no evidence from which we are able to say that the facts establish, as contended by appellants, the taking of their property for public use without compensation being first made contrary to Section 17, art. I of the Texas Constitution; nor do we find on the facts in the result reached by the trial court any denial to appellants, or either of them, of any constitutional right guaranteed by other provisions of the State or Federal Constitutions.

Appellants rightly contend, we believe, that the trial court erred in holding that Caruthers, by accepting the benefits of the Board of Adjustment decision, by building houses on two of the lots containing in excess of 20,000 square feet, rendering impossible reinstatement of the 40,-000 square foot requirement of the zoning ordinance as to such lots, is estopped to complain of the decision of the board denying similar exceptions as to the lots containing less than 20,000 square feet. We know of no principle of law which would support such an estoppel. We are not confronted here with conflicting claims of private parties to private property, but rather with the police power. Presumably the board granted Caruthers exceptions in respect to the lots containing 20,000 square feet in area and more because, and only because, in fact and in law his equities entitled him to these exceptions. The fact that he was successful in obtaining and that he acted upon a quasi-judicial determination that in these instances the police power was subordinate to his private right cannot on any principle known to us be properly said to preclude him from asserting and establishing, if he can, that in other instances the police power was improperly and wrongfully held to be superior to his private rights.

The case of Carle v. Carle, 149 Tex. 469, 234 S.W.2d 1002, being the sole authority cited by appellee in support of the trial court's holding of estoppel, is, we think, plainly inapplicable to a situation such as here where the sole issue is the valid exercise vel non of the police power. Carle v. Carle was a partition suit growing out of a divorce action involving the status of property as community or separate. There the defendant appealed from parts of the judgment. While the appeal was pending, the property was sold and the defendant accepted $7,700 of the proceeds. The effect of such acceptance upon a repartitioning, had the judgment been reversed, is self-evident. We see nothing in the principles announced by the Supreme Court in this case involving solely private rights to private property which would have application to this controversy.

Affirmed.