No. 04-99-00577-CV


Steve WENDE, Charles Brown, and the City of Shavano Park,


Appellants



v.



THE BOARD OF ADJUSTMENT OF THE CITY OF SAN ANTONIO and Martin Marietta
Material
s Southwest, Inc.,

Appellees



From the 288th Judicial District Court, Bexar County, Texas


Trial Court No. 99-CI-01584


Honorable Frank Montalvo, Judge Presiding



ON APPELLEES' MOTIONS FOR REHEARING


Opinion by: Tom Rickhoff, Justice 


Sitting: Phil Hardberger, Chief Justice 

 Tom Rickhoff, Justice 

 Karen Angelini, Justice 


Delivered and Filed: July 19, 2000


APPELLEES' MOTIONS FOR REHEARING GRANTED; REVERSED AND REMANDED


 The motions for rehearing of the Board of Adjustment of the City of San Antonio and Martin
Marietta Materials Southwest, Inc. are granted. This court's opinion and judgment of December 8,
1999, are withdrawn and the following opinion and judgment are substituted therefor.

 In this appeal, we must determine whether the Board of Adjustment of the City of San
Antonio abused its discretion in allowing a quarry to operate as a nonconforming use. We conclude
that the fact that land was leased for quarrying is insufficient to establish a nonconforming use. The
Board abused its discretion in holding otherwise. The evidence does not establish as a matter of law
a preexisting use of the land for quarrying, nor does the evidence establish as a matter of law that the
diminishing asset doctrine applies in this case. Therefore, the Board's decision must be reversed. 
 Factual and Procedural Background


 Martin Marietta Materials Southwest, Inc., formerly known as Redland Stone Products
Company (Redland) operates the Beckmann Quarry, which is located to the east of Interstate 10, to
the west of Northwest Military Highway, and to the north of Loop 1604 in Bexar County. In 1997,
the City of San Antonio entered into nonannexation agreements with Redland and other quarry
owners. These agreements provided that the quarry owners would pay an amount equal to the ad
valorem taxes that would have been assessed against them if the quarries had been annexed. In
exchange for these payments, the City agreed not to annex the quarries before July 1, 1998, to 
develop appropriate quarry zoning regulations before the annexation, and to initiate a zoning case
recommending quarry zoning for the quarries after the first reading of the annexation ordinance. 

 In April 1998, Redland and the owners of two tracts adjoining the quarry, the Schoenfeld and
Rogers tracts, entered into written lease agreements giving Redland the right to quarry on the tracts. 
Later that month, the first reading of the quarry annexation ordinance occurred. Although the
ordinance included the Beckmann Quarry, it did not include the Schoenfeld and Rogers tracts. On
July 5, 1998, the annexation of the Beckmann Quarry became effective. Three days later, the owners
of the Schoenfeld and Rogers tracts petitioned to have these tracts annexed. The annexation of the
tracts became effective in November 1998. The City Council then zoned the Beckmann Quarry as
a quarry district, but zoned the Schoenfeld and Rogers tracts as residential.

 Redland sought to establish its right to operate a quarry on the Schoenfeld and Rogers tracts
as a nonconforming use by filing a registration of nonconforming use with the Director of the
Department of Building Inspections (the Director). The Director approved Redland's registration
statement. After a public hearing, the Board upheld the Director's decision. In its findings of fact
and conclusions of law, the Board stated that the "preexisting lease[s] ... gave Redland ...
nonconforming use rights." 

 Several San Antonio taxpayers and the City of Shavano Park, a municipality near the quarry, 
filed a petition for writ of certiorari in district court, challenging the Board's decision. The district
court granted the writ and affirmed the Board's decision. The City of Shavano Park and two San
Antonio taxpayers, Steve Wende and Charles Brown, now appeal to this court.(1) 

Standing


 Redland argues, without citing any authority, that the appellants do not have standing to
appeal the Board's decision. The statute governing judicial review of decisions of a board of
adjustment grants a right of appeal to "a taxpayer." Tex. Loc. Gov't Code Ann. § 211.011(a)(2)
(Vernon 1999). It is undisputed that appellants Steve Wende and Charles Brown are taxpayers in
the City of San Antonio. As such, they are entitled to challenge the Board's decision under the
express terms of the statute. It was not necessary for them to prove they suffered any particular
damages. See Scott v. Board of Adjustment, 405 S.W.2d 55, 57 (Tex. 1966). 

 The statute also grants a right of appeal to "a person aggrieved by a decision of the board." 
Tex. Loc. Gov't Code Ann. § 211.011(a)(1). The Code Construction Act defines "person" to
include a "government or governmental subdivision or agency." Tex. Gov't Code Ann. §
311.005(2) (Vernon 1998). Therefore, the City of Shavano Park is "a person." A person is
"aggrieved" by the board's decision if the decision adversely affects the person in a manner different
from the way in which it affects a member of the general public. See Scott, 405 S.W.2d at 56. The
Mayor of the City of Shavano Park testified at the hearing before the Board that Redland's blasting
shakes his house and creates dust and noise. He and other residents of Shavano Park testified that
Redland's blasting has damaged their property. The Mayor noted that he has received numerous
complaints from residents regarding the effects of the blasting. This evidence is sufficient to
establish that the City of Shavano Park is "aggrieved" by the Board's decision to allow Redland to
expand its quarrying activities. Accordingly, both the individual appellants and the City of Shavano
Park have standing to pursue this appeal. 

Standard and Scope of Review


 A board of adjustment is a quasi-judicial body. Board of Adjustment v. Flores, 860 S.W.2d
622, 625 (Tex. App.--Corpus Christi 1993, writ denied). The district court may review the legality
of a board's decision by writ of certiorari. See Tex. Loc. Gov't Code Ann. § 211.011(a), (c)
(Vernon 1999). Several principles guide both the district court's and this court's review. 

 There is a presumption in favor of the board's decision, and the party attacking the decision
has the burden to establish its illegality. Flores, 860 S.W.2d at 625. The question is not whether
the board's decision is supported by substantial evidence. See Nu-Way Emulsions, Inc. v. City of
Dalworthington Gardens, 617 S.W.2d 188, 189 (Tex. 1981). Instead, the question is whether the
board abused its discretion. See City of San Angelo v. Boehme Bakery, 144 Tex. 281, 286-87, 190
S.W.2d 67, 70 (1945); Flores, 860 S.W.2d at 625. 

 The abuse of discretion analysis requires a reviewing court to consider whether the questions
presented pertain to factual, legal, or mixed issues. See Flores, 860 S.W.2d at 626. As a quasi-judicial body, a board of adjustment has no discretion in determining what the law is or in applying
the law to the facts. See Walker v. Packer, 827 S.W.2d 833, 840 (Tex. 1992); Citizens Active in San
Antonio v. Board of Adjustment, 649 S.W.2d 804, 806 (Tex. App.--San Antonio 1983, no writ). In
other words, a clear failure to analyze or apply the law correctly is an abuse of discretion. See
Walker, 827 S.W.2d at 840. With respect to factual matters, however, a reviewing court may not
substitute its decision for that of the board. See id. at 839-40; Flores, 860 S.W.2d at 626. 

 Because the Board is a quasi-judicial body, its decisions may be upheld on any possible
theory of law, regardless of the reasons given by the Board in rendering its decision. See, e.g.,
Murmur Corp. v. Board of Adjustment, 718 S.W.2d 790, 799 (Tex. App.--Dallas 1986, writ ref'd
n.r.e.). The Board's findings and conclusions only cite one reason for granting Redland
nonconforming rights--the preexisting leases. But Redland argued two alternative theories before
the Board--actual, preexisting use and the diminishing asset doctrine. Redland argues that under
Murmur, we must uphold the Board's decision if there is evidence from which the Board could have
granted nonconforming rights based on the latter two grounds, even though the Board only cited the
preexisting leases in its findings and conclusions. We rejected this argument on original submission
and held instead that we may affirm on a ground not cited by the Board only if we conclude that
ground applies as a matter of law. See Flores, 860 S.W.2d at 626 (holding that a reviewing court
is not to substitute its decision for that of the board). 

 In their motions for rehearing, Redland and the Board attack our interpretation of the standard
and scope of review, arguing that we improperly shifted the burden to the winning party to uphold
the Board's decision and ignored the appellants' burden to convince nine members of the Board that
the Director's decision was erroneous, see San Antonio, Tx., Unified Development Code § 35-3037(b) (1987). We are not persuaded. Our interpretation is well-supported by precedent. See, e.g.,
Gulf Land Co. v. Atlantic Ref. Co., 134 Tex. 59, 131 S.W.2d 73 (1939); Public Util. Comm 'n v.
Southwestern Bell Tel. Co., 960 S.W.2d 116, 121 & n.7 (Tex. App.­Austin 1997, no pet); Hernandez
v. Texas Workforce Comm'n, No. 4-99-00352-CV, slip op. at 6, 2000 WL 72153, at *4 (Tex.
App­San Antonio Jan. 26, 2000, no pet.).

 In Gulf Land Co., the court reviewed a Railroad Commission order granting a drilling permit. 
The permit was granted on the ground that it was necessary to prevent confiscation of property. The
holder of the permit sought to sustain it on appeal on the ground that it was necessary to prevent
waste. The court held, "In this case we are unable to uphold this permit on the waste theory, because
the Commission made no finding on that question, and we are unable to say, as a matter of law, that
this record shows a necessity for this well for such purpose." Gulf Land Co., 134 Tex. at 76; 131
S.W.2d at 83-84. Although Gulf Land Co. involved a proceeding before an administrative agency,
rather than a board of adjustment, we believe that distinction is irrelevant because the court applied
the same principle that Redland and the Board argue controls here.

 As noted above, Redland and the Board argue that under Murmur we must uphold the
Board's decision if there is evidence from which the Board could have granted nonconforming rights
based on grounds not cited in the Board's findings and conclusions. Murmur held that because the
Board is a quasi-judicial body, its decisions may be upheld on any possible theory of law, regardless
of the reasons given by the Board in rendering its decision. See 718 S.W.2d at 799. In Gulf Land
Co., the court held that when the Commission makes findings of fact, it exercises quasi-judicial
powers. See 134 Tex. at 72-73; 131 S.W.2d at 81. The court explained the principle articulated in
Murmur as follows:

 In the opinion in Magnolia Petroleum Co. v. Railroad Commission, 130 Tex.
484, 109 S.W.2d 967, 970 ... we held that we would not measure the validity of
Commission orders in cases of well permits 'by the reason it gives for same.' We
also in such opinion further held: 'It is no longer an open question that such order or
ruling may be supported upon a ground different from that recited in the order, which
of course is but another way of stating that courts are not bound by the reasons given
by the Railroad Commission, nor by any particular ground made the basis of its
ruling, provided, of course, another valid basis is shown for same.' We still adhere
to the above holdings. They mean that we will sustain a Commission order if it is
correct on any theory of law applicable to the case, and that regardless of whether or
not the Commission gives a correct legal reason for such order, or whether or not it
gives any reason at all therefor. Such rule, however, cannot mean that the district
court can determine a material controverted fact question which was not passed on
at all by the Commission in order to sustain a Commission order. 


Id. at 77; 131 S.W.2d at 84. The court found support for its explanation by analogizing to the rules
that apply to review of bench trials. See id. The supreme court's analysis in Gulf Land Co. is
frequently overlooked. See Hernandez, slip op. at 6; Public Util. Comm'n, 960 S.W.2d at 121 n.7. 
 As we explained on original submission, our interpretation of the standard and scope of
review is also supported by In re Acevedo, 956 S.W.2d 770, 775-76 (Tex. App.--San Antonio 1997,
orig. proceeding). Acevedo was a mandamus proceeding in which a trial judge's decision to
disqualify an attorney was challenged. As in this case, the standard of review was abuse of
discretion. See id. at 773. The real party in interest argued before the trial judge that the attorney
was disqualified on two grounds, but the trial judge based his decision on only one of those grounds. 
This court determined that the ground relied on by the trial judge was invalid. See id. at 775. We
refused to consider whether the other ground was valid because the validity of that ground hinged
on a factual determination that had not been made by the trial judge. See id. We stated, "Although
a trial court cannot abuse its discretion if it reaches the right result, even for the wrong reason, in this
case, we have no result because no factual determination was made ...." Id. (citations omitted). 
Thus, we were "unable to reach a result ... by concluding that a hypothetically predicted result as to
the finding [the trial judge] could have made would not have been unreasonable." Id. at 776; cf.
Tex. R. Civ. P. 299 (providing that when the trial court files findings of fact, the judgment may not
be upheld by presumed findings on another ground if no element of that ground is included in the
findings of fact). 

 We turn now to determine whether the Board abused its discretion in deciding that the
preexisting leases were sufficient to establish Redland's nonconforming rights. 

Preexisting Leases


 A nonconforming use is one that lawfully existed before the effective date of a zoning
restriction and that is allowed to continue to exist in nonconformance with the restriction. See 8A
Eugene McQuillin, The Law of Municipal Corporations § 25.186 (3rd ed. 1984). "Ordinarily,
it is essential to the right to a nonconforming use that the use commenced before the restriction was
imposed, and that it existed when the restriction became effective." Id. It is well established that
a nonconforming use must be actual, rather than merely contemplated. See, e.g., City of Pharr v.
Pena, 853 S.W.2d 56, 64 (Tex. App.--Corpus Christi 1993, writ denied); City of Silsbee v. Herron,
484 S.W.2d 154, 156 (Tex. Civ. App.--Beaumont 1972, writ ref'd n.r.e.); Huguley v. Board of
Adjustment, 341 S.W.2d 212, 218 (Tex. Civ. App.--Dallas 1960, no writ). Acquiring and setting
aside property in contemplation of a future use is insufficient to establish a nonconforming use. See
Caruthers v. Board of Adjustment, 290 S.W.2d 340, 347 (Tex. Civ. App.--Galveston 1956, no writ). 
It is not enough that the property was bought for the nonconforming purpose. See id. Similarly,
leasing land in relianceon existing zoning laws has generally been held insufficient to establish a
nonconforming use. See, e.g., State ex rel. Drury Displays, Inc. v. City of Shrewsbury, 985 S.W.2d
797, 800 (Mo. Ct. App. 1998). 

 Redland argues that the foregoing principles do not apply here because preexisting leases are
sufficient to establish nonconforming rights under the express terms of the City of San Antonio
Unified Development Code. And, as Redland correctly notes, it is within the discretion of a city's
governing body to enact zoning ordinances that it determines are appropriate for the city. See City
of Fort Worth v. Johnson, 388 S.W.2d 400, 402 (Tex. 1964). 

 The rules that apply to the construction of statutes apply as well to the construction of
municipal ordinances. See Mills v. Brown, 159 Tex. 110, 114, 316 S.W.2d 720, 723 (1958). The
cardinal rule of statutory construction is to discern and give effect to the intent of the enacting body. 
See Sorokolit v. Rhodes, 889 S.W.2d 239, 241 (Tex. 1994). We must first seek to discern that intent
from the plain language of the statute or ordinance. See id. But our obligation to enforce the plain
language does not authorize us to employ a "bloodless literalism in which text is viewed as if it had
no context." West Anderson Plaza v. Feyznia, 876 S.W.2d 528, 532 (Tex. App.--Austin 1994, no
writ). Instead, we must consider the context and the consequences that would follow from a
particular interpretation. See Sharp v. House of Lloyd, Inc., 815 S.W.2d 245, 249 (Tex. 1991). We
must avoid interpretations that would produce absurd results or render other language mere
surplusage. See City of Amarillo v. Martin, 971 S.W.2d 426, 430 (Tex. 1998); Sharp, 815 S.W.2d
at 249. Because the interpretation of a zoning ordinance is a question of law, we are not bound by
the Board's interpretation, although the interpretation of an ordinance by the officials charged with
its enforcement may be accorded some weight when we are in doubt. See Citizens Active in San
Antonio, 649 S.W.2d at 806; City of Grand Prairie v. Finch, 294 S.W.2d 851, 854 (Tex. Civ.
App.--Dallas 1956, no writ). 

 Redland relies on the following definitions of "use" and "nonconforming use":

 Use: The purpose for which land or structures thereon is designed, arranged
or intended to be occupied or used, or for which it is occupied, maintained, rented or
leased.


San Antonio, Tx., Unified Development Code § 35-1041 (1987) (emphasis on "leased" added).


 Nonconforming use is the use of an existing property or structure after the
effective date of this chapter, which does [not](2) comply with the use regulations
applicable to the district in which the property is located.


Id. (emphasis on "use" added).


 Redland argues that the definition of "nonconforming use" incorporates the definition of
"use." Thus, a nonconforming use exists when the "purpose for which land ... is ... leased" does not
"comply with the use regulations applicable to the district in which the property is located." Since
it is undisputed that Redland leased the tracts for quarrying purposes before they were annexed,
Redland asserts that quarrying was a nonconforming use.

 Redland's interpretation of these ordinances produces an absurd result. The definition of
"use" includes not only leases, but also any "purpose for which land ... is designed, arranged or
intended to be ... used ...." If the definition of "use" is incorporated within the definition of
"nonconforming use," a person could obtain nonconforming rights simply by establishing the intent
to use the property for the nonconforming purpose some time in the future. This result would be
diametrically at odds with the fundamental conception of nonconforming uses throughout this
country. While we do not question the City's power to adopt such a definition, we agree with the
appellants that if it had desired to do so, it would have more explicitly stated its objective. 

 Redland's interpretation of "nonconforming use" also renders a portion of the Unified
Development Code superfluous. 

 An owner who has an existing "nonconforming use" may continue that use if it files a
registration statement with the Department of Building Inspections pursuant to section 35-3064. Id.
§ 35-3064(a). The owner of a nonconforming use in newly annexed territory must file the
registration statement within one year after the effective date of the annexation. See id. § 35-3064(d). Redland registered its nonconforming use pursuant to this section. 

 Section 35-3067 sets out the procedures for obtaining the right to engage in a nonconforming
use in a newly annexed area when the nonconforming use did not exist before the annexation. Id.
§ 35-3067(b). To obtain the right to engage in a nonconforming use under this section, the owner
must convince the Zoning Commission that "planning for the proposed use was in progress prior to
annexation." Id. § 35-3067(b)(1). At a minimum, the owner must submit a site plan, evidence of
financial commitment, an affidavit of ownership, and a narrative explanation of the proposed project
and its purpose. See id. This is a more onerous burden than filing a registration statement with the
Department of Building Inspections. 

 We can think of no scenario in which an owner would be "planning for [a] proposed use,"
id., without also intending to put the land to that use. Therefore, if the definition of "nonconforming
use" in section 35-3064 includes the purpose for which land is intended to be used, any owner who
is planning for a proposed use could bypass the onerous procedures set out in section 35-3067 and
simply file a registration statement pursuant to section 35-3064. 

 At the hearing before the Board, the Director argued that section 35-3067 only applies if the
owner plans to construct a building or structure that requires a building permit. See id. § 35-3067(b)(2) (allowing the owner six months to secure any necessary building permits). But this
argument does not explain why section 35-3064 would not logically apply in the same
circumstances--under Redland's interpretation of "nonconforming use"--thus rendering section 35-3067 superfluous. 

 We conclude that incorporating the definition of "use" into the definition of "nonconforming
use" produces an absurd result and renders section 35-3067 superfluous. We therefore hold, in
accordance with the precedents of this and other states, that the preexisting leases of the Schoenfeld
and Rogers tracts are not sufficient to establish an existing nonconforming use. 

Preexisting Use


 Redland argues that it presented sufficient evidence for the Board to find that it actually used
the tracts for quarrying before annexation. As Redland recognizes, the question of whether land has
been used for a nonconforming purpose is a question of fact. Because the Board did not make a
finding on this question, we may affirm on this ground only if we determine as a matter of law that
Redland used the tracts for quarrying before annexation. In considering the evidence, we are mindful
that mere preparation for a particular use is not enough to establish an existing, nonconforming use. 
See, e.g., Pena, 853 S.W.2d at 64.

 Redland presented evidence that several permits required for quarrying had been obtained
for both tracts, that some plans had been drawn-up, and that tests had been conducted on the
Schoenfeld tract to determine the mineral reserves existing on the tract. These efforts were merely
preparatory. See 8A McQuillin, supra §§ 25.188, 25.188.20 (explaining that incurring planning
costs, surveying land, filing maps and obtaining permits are examples of mere preparation). 

 There is also evidence that the Schoenfeld tract was used for quarrying at some undisclosed
time in the past and that a 1992 United States Geologic Service topographic map identified a quarry
on the tract. It is undisputed, however, that any blasting, mining, or production on the tract had
ceased before the tract was annexed. The previous, discontinued use does not establish the right to
a nonconforming use. See 8A McQuillin, supra § 25.186 ("It is not enough to establish a right to
a nonconforming use that it existed previously, if it did not exist at the effective date of the
restriction."). 

 Some construction had commenced on both tracts before they were annexed. The nature and
extent of the construction on the Schoenfeld tract is unclear. In June 1998, Redland began
constructing gabions for filtering storm water runoff on the Rogers tract, and in October 1998, it
began constructing a haul road on the tract. The construction of the road cannot establish a
nonconforming use because it was commenced after the petitions for annexation were filed. See
Pena, 853 S.W.2d at 63 ("[A]fter the landowner ... requests annexation he should initiate new uses
of his property at his own peril and without the expectation that they will be allowed to continue as
preexisting nonconforming uses.").

 Redland claims that materials were "stockpiled" on the Schoenfeld tract. The only support
in the record for this claim is found in the deposition of Bo Bankston, Redland's former vice-president of operations. He testified that Redland's president directed him to remove and process
some rock from the tract that had been left there by Schoenfeld. The project was completed in one
day in October or November 1998--well after the petitions for annexation were filed. The president
told Bankston that the purpose of the project was to establish a nonconforming use. 

 Finally, Redland relies on zoning ordinances defining "quarry district" and listing the
permitted uses in a quarry district. See San Antonio, Tx., Unified Development Code §§ 35-3230-3231. It argues that these ordinances indicate what activities the City considers to be part of
a quarry operation. Although the ordinances describe the activities that may occur within a quarry
district, they do not expressly define what constitutes quarrying, nor do they attempt to draw a line
separating preparation for quarrying from actual quarrying. The fact that some of the activities on
the Schoenfeld and Rogers tracts are mentioned in these ordinances does not mean that the activities
amount to quarrying as a matter of law. See, e.g., § 35-3231(6) (stating that an office is a permitted
use in a quarry district). 

 In summary, if the Board had found that Redland actually used the tracts for quarrying before
annexation, the evidence might be sufficient to uphold such a finding. The evidence falls far short
of establishing an existing quarry use as a matter of law. 

Diminishing Asset Doctrine


 Finally, Redland argues that the Board's decision may be upheld on the basis of the
"diminishing asset doctrine." Because the Board did not base its decision on this doctrine, we may
affirm on this ground only if the doctrine applies here as a matter of law. 

 Courts have recognized that quarrying, by its very nature, involves a unique use of land. 
Unlike other nonconforming uses, in which land is merely incidental to the activities conducted upon
it, quarrying contemplates the excavation and sale of the land itself. See In re Syracuse Aggregate
Corp. v. Weise, 414 N.E.2d 651, 654-55 (N.Y. 1980). As a matter of practicality and economic
necessity, a quarry operator will not excavate the entire parcel at once, but will leave areas in reserve
for later excavation. See id. at 655. Because of these unique realities, some courts have condoned
a type of "manifest destiny" for quarries. These courts have recognized that quarrying constitutes
the use of land as a "diminishing asset" and have allowed quarry operations to extend beyond the
area being excavated at the time an ordinance prohibiting quarryingtakes effect. Id.; see also
Stephan & Sons, Inc. v. Municipality of Anchorage Zoning Bd. of Exam'rs & Appeals, 685 P.2d 98,
101 (Alaska 1984). To do otherwise would effectively deprive the owner of the use of the property
as a quarry. See Weise, 414 N.E.2d at 655. 

 Although no Texas case has applied the diminishing asset doctrine to a quarry, other courts
have been "nearly unanimous" in adopting the diminishing asset doctrine. Id. These courts have
emphasized, however, that the doctrine should not be used to extend a nonconforming use
established on one tract of land to physically separate though adjoining tracts. See id.; Stephan &
Sons, 685 P.2d at 102 n.6. Otherwise, zoning laws could be easily avoided by acquiring a tract
adjoining land on which a nonconforming use exists. See Fredal v. Forster, 156 N.W.2d 606, 615
(Mich. Ct. App. 1967). 

 In this case, there is some evidence that the Schoenfeld and Rogers tracts were always
considered part of the Beckmann Quarry; a map attached to the nonannexation agreement between
Redland and the City shows the tracts. The record also establishes, however, that Redland acquired
an interest in the tracts, pursuant to written leases, only a short time before they were annexed and
when it was already clear that their annexation was contemplated. Therefore, it cannot be said, as
a matter of law, that the diminishing asset doctrine should apply to the Schoenfeld and Rogers tracts. 

 The principles relating to nonconforming uses attempt to balance the competing policies of
protecting property interests and avoiding the expansion of uses that are no longer appropriate to a
neighborhood. As cities like San Antonio grow, increasing conflict between these two policies is
inevitable. It is for the citizens of a city, through its governing body, to decide how the competing
interests should be balanced. In this case, a majority of the citizens' representatives on the City
Council voted against allowing quarrying on the Schoenfeld and Rogers tracts. From the record
before us, we are unable to say that the will of the citizens should be overcome by application of the
diminishing asset doctrine. 

Disposition


 For the reasons stated herein, we conclude that the judgment of the district court upholding
the Board's decision must be reversed. Given this conclusion, the parties disagree about the proper
disposition. Redland requests that we remand to the Board so the Board may consider its alternative
theories regarding actual, preexisting use and the diminishing asset doctrine, while the appellants
request that we render judgment in their favor. 

 The appellants argue that section 211.011 of the Texas Local Government Code precludes
remand. Subsection d of that statute requires the Board to state the grounds for its decision, and
subsection f allows the district court to reverse or affirm, in whole or in part, or modify the Board's
decision. See Tex. Loc. Gov't Code Ann. § 211.011(d), (f) (Vernon Supp. 2000). The Board
stated the ground for its decision; subsection d does not preclude a remand so the Board may
consider alternative grounds. And we have previously indicated that the predecessor to subsection
f does not preclude remand. See Metzger v. City of San Antonio, 384 S.W.2d 901, 902-03 (Tex. Civ.
App.­San Antonio 1964, no writ) (holding that the district court was authorized to remand the
proceedings to the Board where the Board failed to make required findings). 

 We believe remanding to the Board is equitable and just under the circumstances of this case. 
See Tex. R. App. P. 43.3. Redland argued the three theories asserted here before the Board. Given
our rejection of the first theory, the Board should have the opportunity to address the other two
theories. Accordingly, this cause is remanded to the Board with instructions to consider Redland's
alternative theories. 

 Tom Rickhoff, Justice 

PUBLISH



1. Both the Board and Redland are appellees. The Board has adopted Redland's brief. 
2. The ordinance actually uses the word "riot," which is obviously a typographical error.