## CIRCUIT COURT OF FAIRFAX COUNTY

Courtland H. Davis,
exor. et al.

v.

Board of Supervisors
of Fairfax Co.

June 12, 1957

Case No. Law 6941

By JUDGE HARRY L. CARRICO

This action seeks to have the Court declare unlawful a decision of the Board of County Supervisors of Fairfax County, Virginia, of December 5, 1956, denying the application of Albert L. Abramson, one of the Plaintiffs herein, for a rezoning to general business of 21.37 acres of land located at the northwest corner of Route One and Oak Street in Fairfax County.

The evidence reveals that the Reid Estate, which is also a Plaintiff herein, is the owner of a tract of land in Mount Vernon District, of Fairfax County, containing slightly under 100 acres, located on the west side of Route One, upon which is located a filling station and an abandoned restaurant. The balance of the property is used as an airport for light planes, the airport existing as a non-conforming use under the County Zoning Ordinance. On March 16, 1956, the representatives of the Reid Estate entered into an agreement with Albert Abramson to lease him 25

acres of the Reid land for a period of ninety-nine years, yielding the Estate for this term an income of approximately $3,800,000.00. The agreement was contingent upon the lessee securing a rezoning of the 25 acres to business, so as to permit the erection of a shopping center thereon by the lessee. Included in the 25 acre parcel was 3.63 acres of land already zoned general business and 4.82 acres of land already zoned rural business. Accordingly, Abramson filed his application before the Board of Supervisors for a rezoning to general business of 21.37 acres, which included the 4.82 acres of rural business land but excluded the 3.63 acres of general business land of the 25 acre parcel.

In accordance with the Zoning Ordinance, the County Planning Commission held a hearing on Abramson's application on December 3, 1956, and reported to the Board of Supervisors on December 5, 1956, that it was the Commission's recommendation that the application be granted. The Board held its hearing on the application commencing at noon on December 5, 1956, and extending until 2:00 A.M. on December 6. At the conclusion of its hearing the Board voted six to one to deny the application and it is this action which is the basis of the present complaint.

The property in question, as has been mentioned, is on one of the busiest highways in the County, which throughout its length in Fairfax County has grown up in hodge-podge fashion with small roadside businesses, such as filling stations, restaurants, motels and grocery stores. On its south side the property is bounded by Oak Street, on which, directly across from the 25 acre parcel, is the Groveton Elementary School. A traffic light is presently installed at Oak Street and Route 1, and the testimony shows that if the proposed shopping center were built, additional traffic control lights would have to be installed on the already burdened Route 1.

Approximately 1.2 miles in an easterly direction from the 25 acre parcel is the Belleview Shopping Center, with an area of 17 acres, of which approxi-

mately 50,000 square feet is occupied by buildings. The evidence shows that this center is inadequate to serve the needs of the population of the Groveton area, and although representatives of the Belleview Center appeared at the Board hearing to object to the granting of the Abramson application, Belleview has taken no part in this action.

In 1952, the County employed a planning consultant, Francis Dodd McHugh, to prepare for it a Master Zoning Plan of the County. In November 1954, Mr. McHugh submitted his proposals, which included a plan for the commercial development of the County, showing at Hybla Valley, distant 1-1/2 miles from the Beacon Hill site, the location of an area of 124 acres for a large shopping center. McHugh called this center a community center, although it should more properly be called, in the terminology of the experts, a regional center. The Board has zoned 77 acres, owned by Banks & Lee, Inc., at Hybla Valley, approximately in the location of McHugh's recommendations, for a regional shopping center, but no construction has begun on this center. According to the testimony of Mr. Schumann, Director of Planning for the County, he was not aware of any proposal of Banks & Lee, Inc., to provide the additional 47 acres needed to fulfil McHugh's recommendation for a total of 124 acres for the center at Hybla Valley. McHugh's proposals encompassed also a plan for residential development and a plan for industrial development. It should be noted that only a residential plan has been adopted by the Board, which departed considerably from McHugh's recommendations. No industrial or commercial plan has been adopted following McHugh's recommendations, although it
was testified in this action that the Board has followed a policy of using the McHugh recommendations as a guide in considering rezoning requests.

On McHugh's plan for residential development, the Beacon Field land is recommended to be residential, with a lot size of 17,000 square feet. However, on McHugh's plan for industrial development, the identical land is recommended to be light industrial. The

Board, in adopting the modified residential plan, placed the major part of this land in a residential classification, without either accepting or rejecting McHugh's recommendation that it be zoned light industrial.

As has been mentioned, a portion of the land to be included in the Abramson development was already zoned general business, and a portion was already zoned rural business. This business land extended from Route One in varying depths from a minimum depth of 200 feet to a maximum depth of 400 feet. This business land also extended along the north edge of Oak Street, across said street from the Groveton Elementary School.

Immediately following the vote by the Board to deny the Abramson application on December 6, 1956, the Board unanimously adopted a resolution that its planning staff and the Planning Commission make a complete and comprehensive study of what would be the ultimate development of the entire Beacon Field property, including a neighborhood shopping center at the approximate location of the land now zoned. Pursuant to this resolution the planning staff prepared and submitted to the Planning Commission and the Board two schemes for the development of the Beacon Field land. On one scheme, the planning staff recommended that 14 acres of this land, or a tract 1000 feet wide and 700 feet deep, be zoned General Business for a shopping center, that 20 acres be zoned for light industry, that 30 acres be zoned for apartments or multiple housing and the balance for single family development. The other scheme recommended that 16 acres be zoned General Business for a shopping center, that 32 acres be zoned for apartments or multiple housing and that 52 acres be zoned for single family units. The first scheme placed the shopping center directly across Oak Street from the Groveton Elementary School. The Planning staff, prior to the Board hearing, had also prepared a study of the area which supported the granting of the Abramson application from the standpoint of the need of additional business land and to service the present population.

The principles of law which govern this Court in the determination of the issue before it are well defined and founded in reason and logic. The Board of County Supervisors has been granted authority by the Legislature to adopt a zoning ordinance to "promote the health, safety, order, prosperity, the conservation of natural resources, and the general welfare." In the administration of such ordinances, by granting or refusing changes in the classification of a particular piece of land, the Board ought to, and by law does, have almost limitless discretion, in the exercise of the police power, to decide which course would best serve the public interest. The law in Virginia is clear that there is a presumption of validity in the acts of a legislative body, and the burden is upon the one who seeks to overturn such acts to show that they are clearly wrong. The courts will only interfere with the acts of a legislative body in this field when it is plain that the exercise of its police power by the Board is in conflict with constitutional guaranties. The basic and underlying golden rule to be followed is the service of the public good. If the Board's action bears a substantial relation to the public health, safety, morals or general welfare, then it must be sustained. The Supreme Court of the United States has said, in the case of Zahn v. Board of Public Works, 47 S. Ct. 594: "If the question of reasonableness is fairly debatable . . . (the Court) . . . will not substitute its judgment for that of the legislative body charged with the primary duty and responsibility of deciding the question."

The above cited principles of law have been followed consistently by the Supreme Court of Appeals of Virginia, in a number of decisions, the most illuminating of which is West Brothers Brick Co. v. Alexandria, 169 Va. 271, in which it is said that zoning ordinances "must not be wholly unreasonable, but they are presumed to be valid and to have been promulgated by those familiar with local conditions. Vested interests will not defeat them, and of course constitutional rights are not to be measured in terms of money. That, however, is a consideration to be remembered. Great financial losses should not be inflicted

where benefits to others are negligible, but public welfare and public convenience do control and are in themselves terms constantly adjusted to meet new conditions. Upon those who would set aside such ordinances rests a heavy burden of proof. They stand when their validity is debatable."

Not only are these principles well founded in the law as a result of numerous decisions throughout the country, but they are also based upon sound logic. For the Courts consistently to interfere with the actions of the legislative body would soon destroy the latter, to be replaced by the Courts in an unlawful usurpation of power. The Board of County Supervisors would soon become a sort of preliminary obstacle for zealous zoning applicants to get past on their hurly-burly dash to the Courts to secure their wishes, and the Court would then be substituted as the zoning authority in place of the Board.

It is with the above principles in mind that the Court has sought a solution to the issue at hand.

The Board, and the Court, have been presented with testimony that if the Beacon Field center is developed, traffic on Route One and intersecting streets will be increased, the safety of the students at the Groveton Elementary School will be jeopardized, and a drainage problem will be created. Certainly it was proper for the Board to consider these matters before coming to a decision on the application before it, and if such testimony reasonably warranted the conclusion that the public health, welfare and safety would be adversely affected thereby, then the action in refusing to grant the application cannot be said to be unwarranted.

There also was presented to the Board, and to the Court, extensive and exhaustive testimony as to the effect of the granting of the Beacon Field application on the already zoned, but as yet non-existent, Hybla Valley center. Much has been said of the competition to Hybla that would be created by Beacon, and of the change in plans that may have to be made at Hybla

if Beacon is developed. The owners of Hybla take the position that the Board, in rezoning their land, has undertaken the obligation not to rezone Beacon, and assumedly any other similarly located land, as a shopping center of sufficient size to threaten competition to Hybla.

The Court is extremely mindful of the law that it must not interfere with the action of the legislative body unless such action is clearly and plainly wrong, and that the burden of proof is heavy upon the one who seeks to upset such action. But that is not to say, that in a proper case, where such burden has been carried, that the Court will hesitate, at the behest of an injured party, to step in and assure him of his constitutional rights. The Court finds this to be such a proper case.

A careful reading and analysis of the testimony before the Board and before this Court cannot reasonably warrant the conclusion that if this rezoning application had been granted the traffic, school and drainage conditions in the area would have been so greatly aggravated as to adversely affect public health, safety, morals and welfare. The traffic situation admittedly is bad now, and so has been for many years. But is it justifiable to say to an owner of land abutting a highway that he cannot use his land as he wishes simply because he will add in some degree to a problem that has been created by others long before his proposed use arose? And is it not better for the public safety that this land be developed in an orderly manner as proposed, rather than on the narrow strip now zoned, where vehicles will be backing onto the highway, and where parking will be inadequate?

If this objection is valid, then none of the major shopping centers in this section should ever have been permitted. It is discriminatory to this land owner to single him out and to say that this objection must bar his use, where it has not barred others similarly situated.

And again, the safety of the school can only be improved by the proposed plan. As has been said, the land is presently used as an airport, which represents a constant and deadly threat to the students in the school and all the residents of the surrounding area. Under the proposed plan, the airport would cease to exist, and the threatened danger from it removed. Does not concern for the public safety demand that consideration should have been given to this element of the case? And yet, does the record not disclose that the Board disregarded this important factor because it questioned the motives of the more than 1200 residents of the area who supported the Beacon center? Apparently the Board felt that these people, who had as vital an interest as anyone connected with the case, favored the shopping center because they saw this as a means of getting rid of the airport. But does the evidence justify such a conclusion? And even if it does, such a position would have been entirely valid in view of all the circumstances of the case, with which these residents were in a position to be familiar. It is unreasonable, in connection with the school, to deny this landowner his desired use of the land, when in other similar instances like projects have been permitted next to or near schools, and particularly when the evidence of the effect upon the school in this case is so nebulous. Let it not be forgotten that the part of the land involved here which lies directly across Oak Street from the school is already zoned for business and can be developed by the owner at any time. The proposed plan of development, with an entrance to the shopping center to the west of the school, certainly minimizes whatever hazard might be created to the school from the proposed shopping center. And that hazard, whatever it might be, is far less than the one that now exists from the airport. It cannot be questioned that it was proper for the Board to weigh the effect of the granting of the application upon the school, but the evidence before the Board and before the Court does not reasonably warrant the conclusion that the safety of the school would be impaired by the proposed development.

I shall only briefly mention the question of drainage as it applies to this case, first of all because of the manner in which it was injected into the Board hearing, and secondly because, from all the evidence, it is clear that this problem can be solved, and the County has the legal means to require its solution, before the proposed project can be built. This is a problem: which exists in every case of proposed development, and it would again be discriminatory to this landowner to deny him his proposed use for this reason, based upon such evidence as the Board had in this case, when others similarly situated, have not been so dealt with.

No reasonable person can question that congested traffic on Highway One and in front of Groveton School can materially affect public safety, or that inadequate drainage might impair public health and welfare, but from all of the evidence in this case, it is plain that these problems are not peculiar to Petitioners' land, nor are they of their making. Doubtless, the proposed plan will add to these problems, but the solution is not to throw up one's hands in despair over them, and resultingly refuse to do that which is reasonable and just.

But, aside from these considerations of traffic, schools and drainage, can there be the slightest question in the mind of anyone connected with this case that the purpose of the refusal of the Board to rezone this land was to forestall any competition to the business which might, or might not, some day be built at Hybla Valley? In arriving at a decision in this case, I have sought, in hearing the evidence, and in reading and re-reading the testimony before the Board and the Court, to arrive at a conclusion that such was not the purpose of this action. Such a conclusion cannot be reached in fairness; one must close his eyes to the obvious and ignore that which is plain, to do so. It is inconceivable, from the evidence, that this application would have been denied if this project did not threaten to compete with the project proposed to be built at Hybla. The Board expressly recognized what various members termed a

"commitment" to the owners of Hybla Valley. Now, what was that "commitment" construed to be by the Board? And what commitment may the Board properly make to a landowner in a situation of this kind? The answer to the first question is that the Board apparently felt itself obligated to "preserve" or "conserve," as one member put it, the position of Banks & Lee, Inc., by refusing to rezone land for projects which would compete with Hybla. The answer to the second question is that the Board may not legally make such a commitment as it recognized in this case. The only commitment, if it can be called that, made to Banks & Lee, Inc., was that, under proper legal circumstances, its land would remain in the zoning classification in which the Board had previously placed it. As Yokley, 2nd Edition, Sec. 84, says: "In passing zoning ordinances a municipal council is engaged in 'legislating' and not in 'contracting' and no one is bound to the municipality as a result, and the municipality binds itself to no one thereby."

Since the Court finds that the purpose of this refusal to rezone was to limit and restrict competition, such action must be declared illegal. Competition is the very foundation of our system of business and government. It should be the purpose of the action of the legislative body to foster and encourage it. To limit or destroy it is to create monopoly. It is conceded that in every zoning action concerning business, some competition may be created or some removed, as a corollary to the action, which is perfectly proper, but it is when the removal or limitation of competition becomes the very purpose of the action that the taint of illegality sets in. Where monopoly is created, (and Banks & Lee, Inc., would have had a shopping center monopoly for 77,000 people, ultimately, under the Board's action) it is the public welfare that then is jeopardized rather than promoted.

The Courts have recognized these principles relating to competition in business activity. In the case of National Linen Service v. Norfolk, 196 Va. 277, which, though not a zoning case, is applicable here, in principle, our Supreme Court of Appeals said:

[T]he authority conferred under a general or implied grant of power must be exercised reasonably, in good faith, and bear a real and substantial relation to the public health, safety, morals or general welfare of the city's inhabitants. In addition, ordinances which in their operation necessarily restrain competition and tend to create monopoly or confer exclusive privileges are generally condemned.

In the case of In re Appeal of Leib, 116 A.2d 860 (1955), the Superior Court of Pennsylvania, in a zoning case, said: "Under some circumstances zoning does limit competition by restricting the area within which it can be established or conducted. This is a by-product of zoning. An ordinance which results in the restriction of competition is not unlawful because of it. But the purpose of zoning is not to limit or restrict competition. It would be unlawful for a council to zone or rezone, or refuse to zone or rezone, for this purpose." It might be noted that in the Leib case the objector to the proposed new business was the owner of an already operating business, and his complaint was denied.

Yokley, in Section 27, says: "Ordinances must be consistent with public legislative policy, may not regulate or restrict trade and must not contravene common right." And Metzenbaum, in his Law of Zoning, page 1595, says: "Creating a monopoly of use by zoning would entail an infraction of the constitutional guarantee against the 'equal protection of the laws.' Such a tendency--whether innocently or designedly brought about--has been stricken down."

The Court was impressed by the testimony of Frederick H. Bair, Jr., an expert witness called by the Petitioners, when asked if zoning was predicated on avoiding competition to business, replied: "The only point at which it is proper in zoning . . . to consider the economic effects is the point at which the economic effects reach into the general welfare. So far as

holding one piece of ground for a shopping center and prohibiting other shopping centers which are needed simply because a prior commitment has been made or a prior piece of land has been zoned does not properly come under zoning as a function."

It should be noted that the Board, in taking the action it did, disregarded the recommendations of its Planning Staff and its Planning Commission. The evidence shows that the Planning Staff had made a careful study of this area (Exhibit K), and had reached the conclusion that the Beacon Field site was the proper place for a shopping center of the size proposed by Petitioners, and that additional business land was needed. The Planning Commission reported its recommendation to the Board for the granting of the application. It should not be overlooked that the McHugh plan proposed the Beacon Field land to be zoned light industrial. Although this plan has not been adopted, the Board has followed the McHugh proposals as a guide in zoning actions. Certainly, if the 100 acres of the Reid land is properly light industrial, then the 25 acres involved in this litigation would properly be general business, as under the existing ordinance an industrial classification would automatically permit a general business use. But nowhere in the record is it disclosed that this important factor was given consideration. It is also significant that all of the Board members, save one, expressed at the hearing a willingness to zone some of the Reid land to General Business, ranging in area from five to sixteen acres, apparently in a spirit of compromise. But, oddly enough, in spite of the recommendations of its experts and of all the members but one, we find that not one square foot of this land was rezoned to General Business, not even that which was already in a Rural Business classification.

Significantly, Mr. McHugh, the expert who made the proposals which are at the root of this litigation, and who, far better than anyone else, should be in a position to explain the reason for them and why they should be followed, was not called to testify in defense of this action. The Court draws no presumptions

from this, but can only conjure why this information was withheld.

In conclusion, the Court finds, from its view of the area involved, from a reading of the evidence before the Board, from the evidence heard in open court, and from the law applicable hereto, that this zoning action bears no substantial relation to the public health, safety, welfare and morals, and therefore cannot be sustained.